Steve W. Berman (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Jeffrey L. Kessler (*pro hac vice forthcoming*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile:  (212) 294-4700
jkessler@winston.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
bens@hbsslaw.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile:  (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

*Counsel for Plaintiffs and the Proposed Classes*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DEWAYNE CARTER, NYA HARRISON, and SEDONA PRINCE, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; PAC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG 12 CONFERENCE, INC.; SOUTHEASTERN CONFERENCE; and ATLANTIC COAST CONFERENCE,<br><br>        Defendants. | No. 23-cv-6325<br><br>**COMPLAINT**<br><br><br>CLASS ACTION<br><br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................. 1

II.     JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT.................................. 10

III.    PARTIES ..................................................................... 11

        A.      Plaintiffs ......................................................... 11

                1.      DeWayne Carter ............................................. 11

                2.      Nya Harrison ............................................... 14

                3.      Sedona Prince .............................................. 15

        B.      Defendants ......................................................... 18

        C.      Co-Conspirators .................................................... 23

IV.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION ............................. 23

V.      RELEVANT MARKETS ........................................................... 28

VI.     HISTORY OF THE NCAA AND ITS ANTICOMPETITIVE
        RESTRAINTS ON ATHLETE COMPENSATION ......................................... 33

        A.      An Overview of the NCAA ............................................ 33

                1.      History and Purpose ........................................ 33

                2.      Governance Structure ....................................... 35

                3.      Bylaws and Enforcement ..................................... 37

        B.      The NCAA's History of Antitrust Violations ......................... 39

        C.      The Supreme Court's *Alston* decision .............................. 42

        D.      *In re College Athlete NIL Antitrust Litigation* .................. 43

        E.      The challenged pay-for-play restraints are not necessary to serve
                any legally valid procompetitive purpose. .......................... 44

                1.      The evidence since the *In re Grant-in-Aid Cap* trial
                        demonstrates that defendants' amateurism justification has
                        no remaining factual support. ............................. 44

                2.      Any claimed procompetitive justification based on

consumer demand for college sports is also legally
irrelevant because it concerns an entirely different market. ..................... 51

3.      Education and compensation for college athletes are not
mutually exclusive. ................................................................... 51

4.      The challenged compensation restrictions do not prevent
exploitation of college athletes—they are exploitative. ........................... 52

5.      The challenged restraints cannot be justified by the
purported need to cross-subsidize non-revenue sports............................. 54

F.      Plaintiffs have been injured by Defendants' anticompetitive
restraints. ......................................................................................... 55

VII.    CLASS ALLEGATIONS ......................................................... 56

VIII.   ANTITRUST ALLEGATIONS.................................................. 59

IX.     CAUSES OF ACTION ............................................................ 60

FIRST CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE
SHERMAN ACT – 15 U.S.C. § 1 PRICE FIXING ......................................... 60

SECOND CLAIM FOR RELIEF  VIOLATION OF SECTION 1 OF THE
SHERMAN ACT – 15 U.S.C. § 1 GROUP BOYCOTT................................... 62

REQUEST FOR RELIEF ............................................................ 64

JURY DEMAND ................................................................... 65

1    For their Complaint against Defendants National Collegiate Athletic Association
2    ("NCAA"), Pac-12 Conference ("Pac-12"), The Big Ten Conference, Inc. ("Big Ten"), The Big
3    12 Conference, Inc. ("Big 12"), Southeastern Conference ("SEC"), and Atlantic Coast
4    Conference ("ACC") (collectively, the "Power Five Conferences" or "P5 Conferences"),
5    Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

## I.    INTRODUCTION

7    1.    Without any procompetitive justification under the antitrust laws, or basic fairness,
8    Defendants NCAA and the Power Five Conferences, and their member schools, have exercised
9    their monopsony power in the labor markets for Division I college sports by fixing the price of
10   scholarships for college athletes. To effectuate this restraint among horizontal competitors,
11   Defendants have passed a byzantine set of rules *prohibiting the* extremely talented young men
12   and women who generate billions of dollars for the Division I sports business from receiving *any*
13   compensation for their athletic services beyond an athletic scholarship and certain types of
14   education-related benefits. These draconian, collusive rules prohibit what the NCAA refers to as
15   "pay-for-play," but what anyone else would call market-value compensation. In college sports,
16   only the athletes are treated as "amateurs." Everyone else involved enjoys the compensation that
17   results from unrestrained competition for the athletes' services. This lawsuit challenges
18   Defendants' anticompetitive "pay-for-play" rules and seeks damages and an injunction so that the
19   young adults who sacrifice for their schools, often risking serious injury, can finally be
20   compensated in a fair and just manner for their extraordinary athletic talents.

21   2.    It is time to dispense with Defendants' fantasy that Division I college sports—
22   especially as conducted among the P5 Conferences—is anything but a massive commercial
23   exercise. That is plain for all Americans to see. And it is equally plain that everyone involved in
24   this ecosystem has a hand in the cookie jar except for the athletes who make it all possible.
25   Defendants are currently raking in billions of dollars from massive broadcast contracts, which
26   televise the athletes' performances, many of whom risk serious injury playing in front of packed
27   coliseums where tickets can cost in the hundreds and thousands of dollars. And these stadiums are

28

-1-

not quaint old-fashioned facilities—rather, Defendants and their member schools spend hundreds of millions of dollars building and renovating lavish playing facilities. Even practice facilities are monuments to the commercial nature of Power-Five-Conference sports—with the University of Texas, for example, announcing this past spring that they would begin construction on a new $70 million complex at the end of the year, featuring both an outdoor practice field and an indoor practice field (fully air-conditioned).[1]

       3.     Defendants are also rewarding themselves with lucrative compensation—annual salaries in the millions of dollars for NCAA executives, conference commissioners, athletic directors, and coaches, among others. Indeed, each of the P5 Conference commissioners are making more than $2.5 million annually, with the highest paid—former Big Ten commissioner, Jim Delany—reportedly earning $10.3 million in his final year at the conference.[2] The salaries for the top head coaches in FBS football and Division I men's basketball exceed $11 million per year,[3] and compensation packages for the top head coaches in Division I women's basketball exceed $3 million per year.[4] This compensation continues to rise, with salaries for coaches in the Power Five Conferences increasing in 2023 by a "whopping 14.3% . . . from 2022."[5] The head football or basketball coach is the highest-paid public employee in states throughout the country,

---

[1] Cole Thompson, *Texas Unveils Plan For New Football Training Facility*, Longhorns Country (April 24, 2023), https://www.si.com/college/texas/news/texas-longhonrs-football-training-facility-sec-2024-moody-center.

[2] Zach Barnett, *Here's how much each Power 5 conference raked in last year*, Footballscoop (July 10, 2020), https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

[3] Amanda Christovich and Doug Greenberg, *Who Is Highest-Paid Coach in College Football?*, Front Office Sports (October 4, 2023), https://frontofficesports.com/who-are-highest-paid-college-football-coaches/.

[4] Greg Lee and Amanda Christovich, *Who Is The Highest-Paid Women's College Basketball Coach?*, (November 6, 2023), https://frontofficesports.com/who-is-the-highest-paid-womens-college-basketball-coach/.

[5] Tom Schad and Steve Berkowitz, Why College Football is King in Coaching Pay–Evenat Blue Blood Basketball Schools, USA Today (October 3, 2023), https://www.usatoday.com/story/sports/ncaaf/2023/10/03/college-football-coach-pay-is-soaring-even-at-basketball-schools/70924373007/.

dwarfing the salaries of college presidents and all other state employees.[6] The profligate spending on coaches is exemplified by the fact that Texas A&M University went so far as to—when firing its head football coach, Jimbo Fisher, in November 2023—agree to pay Fisher more than *$76 million* to buy out the remainder of his contract.[7] In other words, they are paying him $76 million to *not* coach. And this spending on coaches and athletic directors and conference commissioners has no end. A September 2023 report from the Knight Commission on Intercollegiate Athletics contains a financial analysis from CliftonLarsonAllen (CLA), which has projected that within ten years, P5 public institutions' spending on football coaches ($1.363 billion) would virtually equal the spending on athletic scholarships and medical expenses for *all athletes* across *all sports* at those same schools ($1.372 billion).[8]

4.      Juxtaposed against these realities of modern college sports, there is no justification—and certainly no procompetitive justification—for Defendants continuing to prohibit young women and men from earning anything beyond a scholarship for their athletic performances.

5.      The courts have had to wrestle with the NCAA's claims that its massive commercial enterprise should not be subjected to the antitrust laws, like every other business in America, for decades. But the courts have not been fooled. Almost 40 years ago, in 1984, the Supreme Court in *NCAA v. Board of Regents* held that the NCAA violated the antitrust laws and rejected the claim that permitting competition between schools to sell their broadcast rights would destroy consumer demand.[9] Since then, consumer demand for college football has exploded, with output dramatically increasing to allow fans to watch all or virtually all of their teams' games. In

---

[6] Charlotte Gibson,*Who's Highest-Paid in Your State?*, ESPN (last accessed on November 30, 2023),  https://www.espn.com/espn/feature/story/_/id/28261213/dabo-swinney-ed-orgeron-highest-paid-state-employee.

[7] Pete Thamel, *Jimbo Fisher Fired by Texas A&M, to Receive Record Buyout*, ESPN (Nov. 12, 2023), https://www.espn.com/college-football/story/_/id/38880082/jimbo-fisher-expected-fired-texas-sources-confirm.

[8] Financial Projections Through 2032 For Division I FBS Programs, https://www.knight commission.org/wp-content/uploads/2023/09/cla_financial_projections_report_2023.pdf, at p. 2.

[9] *NCAA v. Board of Regents*, 468 U.S. 85, 119 (1984).

for student-athlete services, such that its restraints can (and in fact do) harm competition."[16] Responding to the NCAA's familiar argument that it should be treated differently because of the purported amateur character of college sports, the unanimous Supreme Court rejected this out of hand, observing "that the NCAA and its member institutions are in fact organized to maximize revenues."[17] In a concurring decision, Justice Kavanaugh made the point even clearer—stating that the NCAA's "current compensation regime raises serious questions under the antitrust laws," and that its broader compensation rules (*i.e.*, those that were *not* before the Supreme Court in *Alston* but are challenged here) "may lack" a legally valid procompetitive justification. [18] As he explained, "[t]he NCAA's business model would be flatly illegal in almost any other industry in America."[19] Simply put, "the NCAA is not above the law."[20]

7.     Following the Supreme Court's decision in *Alston*, numerous schools began to offer the increased education-related compensation and benefits made possible by the decision. And once again, relaxation of Defendants' compensation restraints did not cause any harm to college sports.

8.     The next legal chapter in the march towards a free market for the services of college athletes concerned compensation for their valuable names, images, and likenesses ("NIL"). Defendants long complained that such compensation would be ruinous to the popularity of college sports.[21] A new antitrust case, *House v. NCAA* (now consolidated as *In re College Athlete NIL Litigation*), was filed to challenge the NCAA's restraints prohibiting NIL compensation. Then, in the wake of the *Alston* decision, on July 1, 2021, the NCAA suspended most of its NIL rules prohibiting third-party compensation to athletes for the use of their NILs,

---

[16] *Id.* at 2156 (emphasis in original).

[17] *Id.* at 2159.

[18] *Id.* at 2168. (Kavanaugh, J., concurring).

[19] *Id.*

[20] *Id.* at 2169.

[21] *See* Complaint, *House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal. June 15, 2020), ECF No. 1; Complaint, *Oliver v. NCAA*, No. 4:20-cv-04527-CW (N.D. Cal. July 8, 2020), ECF No. 1; Order Granting Joint Stipulation Consolidating *House* and *Oliver* Actions, *In re Athlete NIL Litig.*, No. 4:20-cv-03919-CW (N.D. Cal. July 15, 2021), ECF No. 154.

CLASS ACTION COMPLAINT
011210-11/2405961 V1

while continuing the prohibition on schools and conferences paying compensation for NILs. Since the suspension of those rules, the market for third-party NIL rights has exploded and tens of thousands of college athletes have benefitted, again, without hurting college sports or consumer demand.

9.     In fact, a recent study by Playfly Insights showed that television ratings and game attendance are higher today—after the relaxation of NIL restraints—than ever: "Before 2021, the NCAA argued that any form of payment to amateur athletes, from NIL and revenue sharing to employment status, would have a negative impact on fan interest in college athletics. Since athletes started earning off their name and image, viewership and attendance data for several sports have proven that assumption is incorrect."[22] According to the study, television viewership for college football increased by nearly 15% over the first seven weeks of the 2023 season compared to the same period last year.[23] The same study also revealed that the 2022 season saw the highest overall college football attendance since 2016 and a 5% increase from 2021. According to the report, "college football easily draws more fans than the NFL. For perspective, 42.3 million fans turned out for the 2022 regular season—more than double the annual attendance of the NFL (18.5 million)."[24] The plaintiffs in *In re College Athlete NIL Litigation* recently had their classes certified, and they seek to permanently enjoin all NCAA restraints on NIL compensation.

10.     In the aftermath of all of the new compensation to college athletes permitted over the past decade, not only is consumer demand for Division I college sports stronger than ever, the NCAA, P5 Conferences, and schools are entering into deals that will make them even richer, moving forward, with billions of dollars of new revenue—all generated from the blood, sweat,

---

[22] Playfly Fanscore, College Football Edition 2023 (November 20, 2023), https://playfly.com/fan-score/; *see also* Press Release, Playfly Sports, Leaders in Sports Fan Data, Release Latest Playfly Fan Score: College Football Edition (November 20, 2023), https://playfly.com/press-releases/playfly-sports-leaders-in-sports-fan-data-release-latest-playfly-fan-score-college-football-edition/.

[23] *Id.*

[24] *Id.*

and tears of college athletes. In 2022, for example, the Big Ten announced that it had finalized new broadcast agreements that will generate more than $1 billion *per year* through the 202–-2030 academic year.[25] As another example, ESPN's current contract with the College Football Playoff pays out approximately $470 million per year to the FBS conferences. And when that contract is up for renegotiation in 2026, analysts predict that revenues from the CFP will grow to over $2 billion per year.[26]

11.     Despite this mountain of evidence showing that the "amateurism" model has become a canard, Defendants persist in enforcing their most onerous restraints: the ban on "pay-for-play" compensation to Division I college athletes in the relevant labor markets. Defendants continue to enforce rules that price-fix college-athlete scholarships and that forbid, with few exceptions, any other compensation for their athletic services. The time has finally come for these restrictions too to be struck down. Whatever doubt there may have been about the "amateurism" justification for such pay-for-play restraints when the *Board of Regents*, *O'Bannon*, and *Grant-in-Aid Cap* decisions were rendered, there can be no doubt in the wake of *Alston* and the Interim NIL Policy that this justification must now be finally laid to rest. The antitrust laws can no longer permit a set of pay-for-play restraints that have led to the following, per Justice Kavanaugh: "College presidents, athletic directors, coaches, conference commissioners, and NCAA executives take in six- and seven-figure salaries. Colleges build lavish new facilities. But the student athletes who generate the revenues, many of whom are African American and from lower-income backgrounds, end up with little or nothing."[27]

12.     While there once was a time when the NCAA's amateurism myth had traction, today there is a mounting recognition among college -sports administrators, athletes, and

---

[25] Adam Rittenberg, *Big Ten completes 7-year, $7 billion media rights agreement with Fox, CBS, NBC*, ESPN (August 18, 2022), https://www.espn.com/college-football/story/_/id/34417911/big-ten-completes-7-year-7-billion-media-rights-agreement-fox-cbs-nbc.

[26] Ralph D. Russo, *CFP expansion could increase annual revenue to $2 billion*, AP News (June 11, 2021), https://apnews.com/article/college-sports-football-business-entertainment-college-football-e2e2beb24fac0b8782b96e841cfb9b40.

[27] 141 S. Ct. at 2168 (Kavanaugh, J., concurring).

consumers that there is no justification for the NCAA prohibiting college athletes from sharing freely in the massive revenues that they generate for their schools and conferences. For example, recently, NCAA President, Charlie Baker, proposed creating a new subdivision within Division I to allow schools to compensate college athletes through trust funds and direct NIL payments.[28] As another example, during an August 2023 press conference, University of Michigan head football coach Jim Harbaugh said: "I'm calling for a system that is fair, equitable and benefits all involved, don't exclude the student-athletes from the profits. My opinion, you can't say you're about diversity, equity and inclusion, if you aren't willing to include the student-athletes in revenue sharing. . . . In my opinion, we capitalize on the talent, we should pay the talent for their contributions to the bottom line."[29] And he reiterated this as a recently as December 4, 2023, noting that as commentators discuss the 12-team College Football Playoff set to begin in 2024, "I want you to remember – it's the players. Don't forget to give them a share of the revenue."[30] Other prominent coaches have also spoken out in support of compensating college athletes.[31] And there is significant public support for allowing "pay-for-play." In August 2023, USA Today reported that "[a] new national survey commissioned by Sportico in cooperation with The Harris Poll found that 67 percent of American adults believe college athletes should be paid — not just through name, image and likeness payments but in direct compensation from the school."[32] According to Forbes, "[t]he poll, which surveyed 2,018 people nationally from Aug. 11–13,

---

[28] Nicole Auerbach, *NCAA Proposes Creation of New Subdivision With Direct Compensation for Athletes*, The Athletic (Dec. 5, 2023), https://theathletic.com/5114092/2023/12/05/ncaa-subdivision-athlete-compensation-charlie-baker/ (last visited Dec. 5, 2023).

[29] Tom VanHaaren, *Michigan's Jim Harbaugh backs student-athlete revenue sharing*, ESPN (August 28, 2023), https://www.espn.com/college-football/story/_/id/38277849/michigan-jim-harbaugh-backs-student-athlete-revenue-sharing.

[30] Pete Nakos, *Michigan's Jim Harbaugh: 'Don't Forget to Give Them a Share of the Revenue'*, On3 (Dec. 3, 2023), https://www.on3.com/nil/news/jim-harbaugh-michigan-wolverines-football-college-football-playoff-espn-revenue-sharing/ (last visited Dec. 5, 2023).

[31] Ralph D. Russo, *PSU's Franklin: Revenue sharing with players 'inevitable'*, AP News (April 20, 2023), https://apnews.com/article/franklin-ncaa-nil-nfl-penn-state-00e6cbdd0979d1b20951cbd13ec61124 (quoting Penn State football coach James Franklin).

[32] *Survey shows most people want college athletes to be paid. You hear that, NCAA?* (August 17, 2023) https://www.usatoday.com/story/sports/college/columnist/dan-wolken/2023/08/17/ncaa-wake-up-college-athletes-paid-majority-survey/70613517007/.

CLASS ACTION COMPLAINT
011210-11/2405961 V1

Case No. 4:23-cv-6325

found 67% agreed college athletes should receive direct compensation from their universities[.]"[33]

13.     In sum, there are no procompetitive purposes served by the NCAA's rules prohibiting college athletes from being compensated for their athletic services. All these rules must thus be permanently enjoined. Indeed, even if any of these pay-for-play rules were found to have any justification, it is clear that there are reasonable and patently less restrictive alternatives that would be virtually as effective in achieving any procompetitive purpose. For example, an injunction could forbid enforcement of NCAA "pay-for-play" rules at the national level, but permit such rules at the conference level, where—as presently constituted—no one conference has market power. This way, individual conferences could set rules given their particular circumstances, while still allowing for competition for the services of college athletes from conference-to-conference.

14.     On behalf of a class of all Division I college athletes, Plaintiffs request an injunction permanently restraining Defendants from enforcing all of their unlawful and anticompetitive rules restricting Defendants and their members from compensating class members for their athletic services.[34]

15.     Substantial damages for Defendants' past antitrust violations are also required and calculable for the athletes who participated in the highest-revenue sports of FBS football and Division I men's and women's basketball within the P5 Conferences. Accordingly, on behalf of the members of a Damages Class of FBS football players and Division I men's and women basketball players who participated for a P5 school or Notre Dame, Plaintiffs seek treble damages for the compensation these athletes would have received absent Defendants' unlawful restraints on pay-for-play compensation.[35]

---

[33] *Why The Public Strongly Supports Paying College Athletes* (August 21, 2023) https://www.forbes.com/sites/nicolekraft/2023/08/21/why-the-public-strongly-supports-paying-college-athletes/?sh=44e9cd741b08.

[34] *See infra*, Part VII (defining the Declaratory and Injunctive Relief Class).

[35] *See infra*, Part VII (defining the Damages Class).

-9-

## II.   JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT

16.   **Jurisdiction.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed classes are citizens of a state different from the Defendants.

17.   This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. A number of NCAA Division I universities or colleges are also found within this District (*e.g.*, the University of California-Berkeley, Stanford University, Santa Clara University, the University of San Francisco, St. Mary's College). And Defendant Pac-12 is headquartered in this District.

18.   **Venue.** Venue is proper because Defendants reside, are found, have agents, and transact business in this District, as provided in 28 U.S.C. § 1391 and 15 U.S.C. § 22.

19.   **Divisional Assignment.** This action arises in Alameda County or San Francisco County because that is where a substantial part of the events that give rise to the claims occurred. Within Alameda County is found the University of California Berkeley ("Cal") campus. Cal, for example, fields 31 Division I intercollegiate sports teams, 24 of which compete in the Pac-12. Current and former Cal athletes have been subjected to the violations described herein. Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or to the Oakland Division.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.   PARTIES

**A.     Plaintiffs**

**1.     DeWayne Carter**



20.     Plaintiff DeWayne Carter ("Carter") is a resident of Durham, North Carolina, and currently is a fifth-year senior and defensive tackle for Duke University's ("Duke") football team.

21.     Carter was a heavily recruited star athlete from Pickerington, Ohio. He was a 4-year letterman at Pickerington Central and was rated the No. 33 defensive tackle in the nation according to *Rivals.com* and *247Sports.com*. With help from Carter, Pickerington Central reached the Ohio High School Athletic Association (OHSAA) Division I semifinals during Carter's sophomore and senior years and won the state title Carter's junior year. Carter was a 2-time all-conference and all-district selection. And his senior year, he was a team captain and earned first team all-state honors from the Associated Press.

22.     As a coveted 3-star recruit, Carter had full scholarship offers from roughly 20 Power Five schools, including the University of Michigan, the University of Tennessee, Notre Dame, Boston College, and Duke. He ultimately accepted a full scholarship offer from, committed to play football for, and enrolled at Duke in the summer of 2019.

23.     Carter redshirted the 2019 season—playing 3 games that season—and played all 11 games in the 2020 season. During the 2020 season, Carter received the Ace Parker Award—an

honor that Duke's football program "present[s] annually to an individual who displays unparalleled commitment to the team and overcomes adversity to contribute."[36]

24.     In 2021, as a redshirt sophomore, Carter was named team captain: an honor that he has held every season since. He is the first player in program history to earn that honor for 3 seasons.

25.     Carter's on-field accomplishments in 2021 were far-reaching. He started 12 games, was on field for 801 snaps, and was first in the ACC and tied for eleventh in the nation in forced fumbles. He was selected the ACC Defensive Lineman of the Week, after having 3 tackles, 2 forced fumbles, 1 pass-breakup, and 1 quarterback-pressure against Northwestern. He was a Third Team All-ACC selection and the recipient of the program's Mike McGee Award—an honor presented each year to the team's top defensive lineman.

26.     In 2022, Carter started all 13 games, and was, again, a gamechanger. He tied for first in the ACC and third nationally in fumble recoveries, and was fourth in the ACC and thirteenth nationally in forced fumbles. He returned a fumble 35 yards for a touchdown against NC A&T—the sixth-longest fumble recovery for a touchdown in program history—and registered 2 pass-breakups against the University of Central Florida in the Military Bowl, making him 1 of just 7 players in Duke history to do so in a bowl game. As a result of his achievements, Carter was a Second Team All-ACC selection and Third Team All-America selection by College Football Network.

27.     In 2023, as a returning starter, Carter played in each of Duke's 12 regular-season games. He is just the seventeenth player in Duke history to record 11.5 career sacks and is fourth in program history in forced fumbles. As a third-year captain, Carter will lead Duke in the Birmingham Bowl on December 23.

28.     Along with his many athletic achievements, Carter is an outstanding student. He is majoring in psychology, with a double minor in theater and education. In 2021 and 2022, he was named an Arthur Ashe Jr. Sports Scholars finalist, which honors students of color who have

---

[36] *DeWayne Carter*, Duke University, https://goduke.com/sports/football/roster/dewayne-carter/19207.

excelled both in the classroom and in their sport. He is a 3-time ACC Academic Honor Roll recipient, and in 2023, he received the ACC's Jim Tatum Award, which goes to the top senior student-athlete in the Conference.

29.     Carter is an active member of Duke's United Black Athletes and Student-Athlete Advisory Committee and has represented the school on the Division I NCAA Football Oversight Committee Student-Athlete Connection Group. Showing his commitment to the broader Durham community, Carter has worked with Habitat for Humanity, tutored at KIPP Durham College Preparatory School and Durham Public School Ignite, made time to read to youths at Southwest and Glenn Elementary, and coached youth league baseball for First Calvary Baptist Church.

30.     Following graduation, Carter intends to pursue his NFL aspirations. After his hoped-for NFL career, Carter plans to become a teacher and open a community center to continue being a strong male role model.

31.     Carter has been a valuable asset to Duke and the ACC. As a high-performing player on the football team, he has helped to generate substantial revenues that the university and the Conference derive from Duke football, through, among other things, broadcasting agreements, ticket sales, and sponsorships. But the NCAA's pay-for-play rules have prohibited him from earning any compensation or benefits for his athletic services, aside from the limited (and fixed) categories of compensation that the Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conference Defendants' rules reinforcing these restraints—Carter would have received substantial additional compensation in the relevant labor market for his services. He has been harmed, and is continuing to be harmed, by these anticompetitive rules.

1

2.      **Nya Harrison**



32.      Plaintiff Nya Harrison ("Harrison") is a resident of Palo Alto, California and currently is a junior and a defender on Stanford University's ("Stanford") Division I women's soccer team.  This past season the Stanford women's soccer team defense was ranked #1 in the country.

33.      Harrison was a highly recruited athlete from San Diego, California. She led her high school, Del Norte High School, to a quarterfinal finish at the 2018 San Diego Section CIF Division II Championship, and led her competitive club team—the San Diego Surf—to a No. 1 ranking in the 2019-2020 season.

34.      In addition, Harrison is part of the United States National Team system and has competed in 5 domestic and 1 international camp for the U16 and U18 teams. She has played in 7 matches as part of the United States National Team program, including with the U18 team at the Tricontinental Cup, and participated in the U20 Women's National Team Call-Up Camp.

35.      Harrison was recruited by several Division I schools to play soccer, including the University of Southern California, University of California – Los Angeles, University of California – Berkeley, and Notre Dame. Ultimately, Harrison accepted an offer to play for, and enrolled at, Stanford in August 2021.

36.      Harrison made an immediate impact for the Stanford women's soccer team. As a

-14-

freshman, in 2021, she appeared in 6 matches, and helped a back line that posted 9 shutouts and limited opponents to 0.85 goals per match.

37.     As a sophomore, in 2022, she was an integral part of a Pac-12 Championship-winning team, appearing in 9 matches and leading Stanford to 12 shutouts, while limiting opponents to 0.55 goals per game.

38.     As a junior, Harrison helped lead Stanford to the NCAA National Championship game.

39.     Off the pitch, Harrison is a dedicated student and advocate. She is a Bioengineering major and was named to the Pac-12 Fall Academic Honor Roll in 2022. She is the President of CardinalBLCK, a group of Black college athletes that have banded together to promote social justice, amplify Black voices both inside and outside of athletics, and create a community to endure beyond the athletes' time at Stanford.

40.     After her senior season, Harrison hopes to play soccer professionally.

41.     Harrison has been harmed, and is continuing to being harmed, by the NCAA's rules prohibiting pay-for-play—and the Conference Defendants' rules reinforcing these restraints—which have artificially restricted her from earning compensation for her athletic services in the relevant labor market.

**3.     Sedona Prince**



CLASS ACTION COMPLAINT                                                                Case No. 4:23-cv-6325
011210-11/2405961 V1

42.     Plaintiff Sedona Prince ("Prince") is a resident of Fort Worth, Texas and a current Division I athlete who competes for the Texas Christian University ("TCU") women's basketball team.

43.     In high school, Prince started in all 154 games, totaling 2,759 points scored, 1,493 rebounds, and 924 blocked shots. In 2018, she was a McDonald's High School All-American and Jordan Brand Classic participant, and she was named the Texas Girls Coaches Association Basketball Athlete of the Year.

44.     Prince was a highly-recruited prospect out of high school and many universities competed for her talent during the recruitment process. She received full athletic scholarship offers from numerous top Division I programs, including the University of Connecticut, University of Notre Dame, University of Louisville, and University of Texas at Austin ("UT"). She ultimately accepted the offer from Texas and committed to play basketball and attend school at UT starting in 2018.

45.     Prince redshirted her freshman season at UT after she was injured while representing Team USA at the U18 FIBA Americas Championship in Mexico City in the summer of 2018, where Team USA won the gold medal. Prince had to undergo several surgeries after her injury, incurring medical bills in the tens of thousands of dollars. In the summer of 2019, Prince decided to transfer to the University of Oregon ("UO") but, due to NCAA transfer rules, she was forced to sit out of the 2019–20 season. Although UO applied for a hardship waiver to restore her freshman year of eligibility, the NCAA denied the request. She was able to travel with the team, but she could not play in the games.

46.     Prince played in 50 games for the Ducks over the course of the next two seasons averaging 9.7 points, 4.5 rebounds, and 1.4 blocks per game, and leading her team to the NCAA Championship Tournament Sweet 16.

47.     During that time, the UO basketball games were nationally televised by ESPN or on the Pac-12 Network. In 2022, the Pac 12 distributed $37 million to each of its member schools from television revenue.

48.     Prince did not receive any share of that revenue, nor was she otherwise compensated by Defendants for her labor other than by receiving a scholarship and other education-related expenses.

49.     In 2022, Prince suffered another season-ending injury and underwent surgery to repair a torn ligament in her elbow. She was forced to sit out of the 2022–23 basketball season.

50.     Prince initially declared for the 2023 WNBA Draft but later rescinded her name from inclusion in the Draft pool after discovering that she had one year of college eligibility remaining. Prince opted to enter the NCAA transfer portal and ultimately transferred to TCU, where she is currently attending school and playing basketball.

51.     Going into the 2023–24 season, Prince was recognized as a Preseason All-Big 12 Honorable Mention and she has led the Horned Frogs to the best start in school history, 9-0.

52.     All of Prince's basketball games at TCU will be televised under the Big 12 Conference's current $2.3 billion media contract with ESPN and Fox Sports. Yet Prince will not receive any share of those revenues nor any other compensation for her labor beyond a scholarship because NCAA rules prohibit her from doing so.

53.     Prince has been a valuable asset to the Power Five schools she has attended, most recently TCU. As a high-performing player on the basketball team, she has helped to generate substantial revenues that the university and the conferences (Pac-12 and Big 12) derive from basketball, through, among other things, broadcasting agreements, ticket sales, and sponsorships. But the NCAA's pay-for-play rules have prohibited her from earning any compensation or benefits for her athletic services, aside from the limited (and fixed) categories of compensation that the Defendants allow (primarily an athletic scholarship). But-for the NCAA's anticompetitive rules prohibiting pay-for-play compensation—and the Conference Defendants' rules reinforcing these restraints—Prince would have received substantial additional compensation in the relevant labor market for her services. She has been harmed, and is continuing to be harmed, by these anticompetitive rules.

**B.    Defendants**

54.    **The National Collegiate Athletic Association ("NCAA")** describes itself as an "unincorporated not-for-profit educational organization founded in 1906," and maintains its principal place of business located at 700 W. Washington Street, Indianapolis, Indiana 46204. The NCAA further states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level." It is composed of more than 1,100 colleges, universities, and athletic conferences located throughout the United States.

55.    Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions. The NCAA has also established an enforcement program to ensure that institutions and athletes comply with NCAA rules. Through its enforcement program, the NCAA has the authority to impose severe penalties on member schools and athletes for non-compliance.

56.    The NCAA includes 1,102 active member schools, and these schools are organized into three Divisions. Division I includes 353 schools, including 242 with major football programs. Divisions II and III include schools with much less extensive or no football programs. As a practical matter, any academic institution that wishes to participate in the highest and most popular levels of college sports, generating the most revenues, must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its Division I members.

57.    In its Consolidated Financial Statements for the fiscal year ending August 31, 2021, the NCAA reported total revenues of $1,115,003,304.[37] This is in addition to all of the billions of dollars in revenues generated from sports by the P5 Conferences and their member schools.

58.    **Pac-12 Conference ("Pac-12")** is an unincorporated association, with its principal place of business located in this District at 360 3rd Street, third floor, San Francisco, California 94107. The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference

---

[37] NCAA Consolidated Financial Statements August 31, 2021 and 2020.

-18-

member" of Defendant NCAA's Division I. In its 2020 IRS Form 990, the Pac-12 identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2020, it obtained gross revenues of $533,787,888. The Pac-12's 2021–2022 Handbook states that the conference was organized for several purposes including: "[t]o provide its members with a jointly governed body for sponsoring, supervising and regulating inter-collegiate athletics as a conference member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their intercollegiate athletics programs."

59.     The Pac-12's current members are the following 12 institutions: University of Arizona, Arizona State University, University of California–Berkeley, University of Colorado, University of Oregon, Oregon State University, Stanford University, University of California–Los Angeles, University of Southern California, University of Utah, University of Washington, and Washington State University. All but Oregon State University and Washington State University have announced that they are leaving the Pac-12 in the 2024–2025 academic year to participate in a different P5 Conference. These moves have been motivated by the pursuit of ever-higher revenues by the schools, despite imposing greater travel burdens on the schools' athletes, as other conferences have been more successful than the Pac-12 in entering into new, ever-more lucrative broadcasting agreements. All of the Pac-12 members are also members of the NCAA's Division I, Football Bowl Division.

60.     Defendant Pac-12 during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

61.     **The Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Big

-19-

Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenue of $758,899,883.

62.     The Big Ten's members are the following 14 institutions: University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, University of Wisconsin–Madison, University of Maryland, and Rutgers University. All of the Big Ten's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

63.     Defendant Big Ten during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

64.     **The Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2021 IRS Form 990, the Big 12 stated that is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2021, it obtained gross revenues of $356,214,140. The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service compatible with both academic and competitive excellence."

65.     The Big 12's current members are the following 14 institutions: Baylor University, Brigham Young University, University of Central Florida, University of Cincinnati, University of Houston, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas–Austin, Texas Christian University, Texas Tech University, and West Virginia University. All of the Big 12's football members are

-20-

1   also members of the NCAA's Division I, Football Bowl Subdivision.

2      66.    Defendant Big 12 during the Class Period participated in the collusive restraint of

3   trade and other violations of law alleged in this Complaint, has thereby damaged class members,

4   and will continue to damage class members unless enjoined.

5      67.    **Southeastern Conference ("SEC")** is an unincorporated association, with its

6   principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham,

7   Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal

8   "conference member" of Defendant NCAA's Division I. In its 2021 IRS Form 990 the SEC

9   identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal

10  Revenue Code, and stated that, for the fiscal year ending August 31, 2021, it obtained revenues of

11  $833,383,274. It further says its mission is to "promote and administer intercollegiate athletic

12  competition among its fourteen member non-profit institutions of higher education located in the

13  Southeastern United States."

14     68.    The SEC's current members are the following 14 institutions: University of

15  Florida, University of Georgia, University of Kentucky, University of Missouri, University of

16  South Carolina, University of Tennessee, Vanderbilt University, University of Alabama,

17  University of Arkansas, Auburn University, Louisiana State University, University of

18  Mississippi, Mississippi State University, and Texas A&M University. All of the SEC's football

19  members are also members of the NCAA's Division I, Football Bowl Subdivision.

20     69.    Defendant SEC during the Class Period participated in the collusive restraint of

21  trade and other violations of law alleged in this Complaint, has thereby damaged class members,

22  and will continue to damage class members unless enjoined.

23     70.    **Atlantic Coast Conference ("ACC")** is an unincorporated association with its

24  principal place of business located at 4512 Weybridge Lane, Greensboro, North Carolina 27407.

25  The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of

26  Defendant NCAA's Division I. In its 2021 U.S. Internal Revenue Service ("IRS") Form 990, the

27  ACC stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal

28

-21-

Revenue Code, and that, for the fiscal year ending June 30, 2021, it obtained gross revenues of $578,309,944.

71.     The ACC's current members are the following 15 institutions: Boston College, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University of North Carolina–Chapel Hill, North Carolina State University, University of Pittsburgh, Syracuse University, University of Virginia, Virginia Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University, and the University of Louisville. Also, as the ACC stated in its 2012–13 annual report, the University of Notre Dame "officially joined the ACC on July 1, 2013 . . . Notre Dame will compete as a full member in all conference sponsored sports with the exception of football, which will play five games annually against league programs."

72.     Defendant ACC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to damage class members unless enjoined.

73.     Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are often collectively referred to as the "Power Five Conference Defendants" or "Conference Defendants," and these conferences are also referred to collectively in this Complaint as the "Power Five Conferences" or" P5 Conferences."

74.     The Power Five Conferences' influence over college sports is undeniable. In 2014, NCAA reformed its Division I governance model to allow the Power Five Conferences to independently create some of their own rules—separate and apart from other Division I conferences—including rules pertaining to the calculation of COA, medical coverage for college athletes, and pay for athletes' families to attend games.[38] This outsized influence has also shown itself on the playing field. For instance, Power Five schools have won *every* FBS football championship since 1985.

---

[38] Jon Solomon, *NCAA Adopts New Division I Model Giving Power 5 Autonomy*, CBS Sports (Aug. 7, 2014), https://www.cbssports.com/college-football/news/ncaa-adopts-new-division-i-model-giving-power-5-autonomy/ (last visited Dec. 5, 2023).

75.     Whenever in this Complaint Plaintiffs make reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

**C.     Co-Conspirators**

76.     Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the rules discussed in Part VI, *infra*, and thus agreed to impose the restraint on trade described herein. All Division I schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the restraints.

### IV.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

77.     Defendants' anticompetitive agreements are not secret or disputable. They are a matter of public record, codified in the NCAA Division I Manual (the NCAA's rulebook) and the rulebooks of each Conference Defendant. These rules are textbook horizontal agreements that unreasonably restrain trade by prohibiting conferences and schools from paying more than a fixed amount of compensation (primarily in the form of a financial-aid scholarship) for the services of college athletes. They are proposed, drafted, voted upon, and agreed to by the NCAA members—including the Conference Defendants—that compete for the services of college athletes in the various relevant labor markets. These anticompetitive rules are also strictly enforced, so that the competing NCAA member institutions have no choice but to comply with them or face severe cartel penalties.

78.     Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with

the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference, divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program."[39]

79.     The challenged NCAA rules, and each Conference Defendant's rules, that prohibit, cap or otherwise limit the compensation that players may receive for their athletic services are illegal cartel agreements. These rules include, but are not limited to, NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 15.02.2, 15.02.6, 15.1, 16.02.3, 16.1.4, and 16.11.2 (individually, and as interpreted and applied in conjunction with each other).

80.     Article 12 of the NCAA Bylaws ("Amateurism and Athletics Eligibility") is the foundation of Defendants' unlawful agreements to fix the amount of compensation that may be paid to college athletes for their athletic services. Bylaw 12.1.2 provides:

> A [college athlete] loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: (a) [u]ses athletics skill (directly or indirectly) for pay in any form in that sport; [or] (b) [a]ccepts a promise of pay even if such pay is to be received following the completion of intercollegiate athletics participation . . . .

81.     Bylaw 12.1.2.1 then includes a non-exhaustive, two-page list of "Prohibited Forms of Pay," including any "direct or indirect salary, gratuity or comparable compensation"; any "division or split of surplus (bonuses, game receipts, etc.);" any "[e]ducational expenses not permitted by the governing legislation of this Association [*i.e.*, the NCAA]"; and any "[p]referential treatment, benefits or services." The NCAA rules then continue with nearly two pages of "Exceptions to Amateurism Rule." Bylaw 12.1.2.4, *et seq.* Unless an exception applies, the NCAA Bylaws categorically prohibit conferences and schools from providing any form of pay to college athletes.

82.     Article 15 of the NCAA Bylaws ("Financial Aid") restricts the amount and type of, and method by which, schools can provide financial aid to athletes. Financial aid "is not

---

[39] Unless otherwise noted, all references to the NCAA Constitution or NCAA Bylaws herein refer to the provisions in the 2023–24 NCAA Division I Manual available at https://www.ncaapublications.com/p-4673-2023-2024-ncaa-division-i-manual.aspx.

-24-

considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by [NCAA's] membership." *See* Bylaw 12.01.4. Bylaw 15.1 allows athletes to receive financial aid "based on athletics ability" "up to the value of a full grant-in-aid, plus any other financial aid up to the cost of attendance." "Full Grant-in-Aid" is "financial aid that consists of tuition and fees, room and board, books and other expenses related to attendance at the institution up to the cost of attendance." NCAA Bylaw 15.02.6. "Cost of attendance" (or COA) is the "amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, living expenses, books and supplies, transportation, and other expenses related to attendance at the institution." NCAA Bylaw 15.02.2. If an athlete receives financial aid in excess of the COA, they "shall not be eligible to participate in intercollegiate athletics." NCAA Bylaw 15.1.

83.     Article 16 ("Awards, Benefits and Expenses for Enrolled Student-Athletes") similarly prohibits NCAA members from providing benefits to athletes based on their athletic abilities. Bylaw 16.11.2 provides, "The student-athlete shall not receive any extra benefit." "Extra benefit" is defined as "any special arrangement by an institutional employee or representative of the institution's athletics interests to provide the student-athlete or the student-athlete's family members or friends with a benefit not expressly authorized by NCAA legislation." *See* NCAA Bylaw 16.11.2; *see also* NCAA Bylaw 16.02.3.

84.     Notwithstanding the NCAA's rules against "extra benefits," Defendants allow certain types of athletic-related compensation that clearly is *not* financial aid. For example, the NCAA's rules allow schools or conferences to provide specified amounts of monetary awards for "winning an individual or team conference or national championship" (NCAA Bylaw 16.1.4.2); for "special achievements, honors and distinctions" (NCAA Bylaw 16.1.4.3); and as academics or graduation incentives (NCAA Bylaw 16.1.4.5). Defendants do not have any coherent economic explanation for why certain categories of compensation are consistent with their concept of "amateurism," while others are not. *See, e.g.*, Sept. 18, 2018 Trial Transcript at 1302:14–21, *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.* (testimony of Kevin Lennon, NCAA Vice

-25-

President for Division I Governance) ("[O]ur institutions have always been able to provide educational expenses to student athletes to support their educational pursuits and [] they've been able to provide benefits incidental to participation to student athletes. And while those have changed over time, they certainly have not impacted the principle of amateurism which is we just don't pay student athletes.").

85.     The collective purpose and effect of Defendants' anticompetitive rules is to suppress and restrict the amount of compensation that can be provided to college athletes for their services, so that the amount actually paid is significantly less than what would be provided in competitive labor markets for the athletes' services.

86.     In sum, the Defendants' anticompetitive, horizontal agreements fix and severely limit the amount of compensation that college athletes may receive for providing athletic services to their schools and conferences. While the Defendants agree to and impose other anticompetitive rules—such as those restricting athletes' ability to profit from the commercial use of their NILs—this Complaint is directed at Defendants' rules that prohibit or restrict direct payments for athletics services, what Defendants refer to as "pay-for-play."

87.      As NCAA members, the Conference Defendants have agreed to the NCAA rules cited above to prohibit "pay-for-play" and have also adopted their own rules (which may be more restrictive but not more permissive than the NCAA's rules) to reinforce the NCAA's pay-for-play restraints. Examples of the Conference Defendants' anticompetitive rules include:

A.     ACC Constitution, Article 1.2.1 ("General Purpose"): "The Conference aims to . . . [c]oordinate and foster compliance with Conference and NCAA rules."[40]

B.     ACC Manual, Bylaw 2.2 ("NCAA Regulations"): "All [ACC] Members are bound by NCAA rules and regulations, unless Conference rules are more restrictive."[41]

C.     Big Ten Conference Handbook, Rule 14.01.3 ("Compliance with NCAA and Conference Legislation"): "The Constitution and Bylaws of the National

---

[40] ACC Manual, 2020–21, https://virginiatech.sportswar.com/wp-content/uploads/sites/15/2022/08/2020-21-ACC-Manual-2020-9-17-2.pdf (last visited Nov. 24, 2023).

[41] *Id.*

1   Collegiate Athletic Association shall govern all matters of student-athlete
2   eligibility except to the extent that such rules are modified by the Conference
3   Rules and Agreements."[42]

D.   Big 12 Bylaw 1.2.3 ("Adherence to NCAA Rules"): "All Members of the
     Conference are committed to complying with NCAA rules and policies. . . . In
     addition, the conduct of Members shall be fully committed to compliance with the
     rules and regulations of the NCAA and of the Conference."[43]

E.   Big 12 Bylaw 6.1 ("Eligibility"): "A student-athlete must comply with appropriate
     minimum requirements of the NCAA and the Conference in order to be eligible for
     athletically related aid, practice, and/or competition in any intercollegiate sport."[44]

F.   Big 12 Bylaw 6.4.3 ("Financial Aid Reports"): "Each institution shall comply with
     all financial aid legislation of the NCAA and the Conference."[45]

G.   Pac-12 Bylaw 4-2 ("Application of NCAA Legislation"): "The Conference is a
     member of the NCAA, therefore, all member institutions are bound by NCAA
     rules and regulations unless the Conference rules are more demanding."[46]

H.   Pac-12 Executive Regulation 3-1 ("NCAA Rules"): "The rules of the National
     Collegiate Athletic Association shall govern all matters concerning financial aid to
     student-athletes except to the extent that the CEO Group modifies such rules to be
     applied on a conference wide basis."[47]

I.   SEC Constitution, Article 5.01.1 ("Governance"): "The Conference shall be

---

[42] Big Ten Conference Handbook, 2017–2018, https://s3.us-east-2.amazonaws.com/sidearm.nextgen.sites/iuhoosiers.com/documents/2018/4/5/2017_18_Big_Ten_Conference_Handbook.pdf? timestamp=20180405125319 (last visited Nov. 24, 2023).

[43] Big 12 2021–22 Conference Handbook, https://s3.amazonaws.com/big12sports.com/documents/2021/8/16/Handbook_v_3_08_16_2021_.pdf (last visited Nov. 24, 2023).

[44] *Id.*

[45] *Id.*

[46] Pac-12 Conference 2021–22 Handbook, Aug. 1, 2021, https://pac-12compliance.org/wp-content/uploads/2021/08/2021-22-P12-Handbook.V1.pdf (last visited Nov. 24, 2023).

[47] *Id.*

-27-

governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."[48]

J.   SEC Bylaws 15.01.1 ("Institutional Financial Aid Permitted"): "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations."[49]

88.   NCAA member schools are subject to severe punishment if they do not adhere to the NCAA's anticompetitive rules limiting athlete compensation. NCAA Bylaw 20.10.1.5 ("The Commitment to Institutional Control and Compliance") provides, "It is the responsibility of each member institution to monitor and control its athletics programs, staff members, representatives and student-athletes to ensure compliance with the constitution and bylaws of the Association," including "report[ing] all breaches of conduct established by the[] bylaws to the [NCAA] in a timely manner and cooperat[ing] with the [NCAA's] infractions process." "Upon a conclusion that one or more violations occurred, an institution shall be subject to such disciplinary and corrective actions as may be prescribed by the [NCAA] on behalf of the entire membership." *Id.* All NCAA members are thus forced to abide by the NCAA's illegal restraints on compensation to college athletes as co-conspirators or face serious punishment (including a potential "death penalty," where a school is banned from the multi-billion-dollar business of college sports for a year or more).

89.   The enforcement procedures for the NCAA's anticompetitive rules are codified in Article 19 ("Infractions Program") of the NCAA Bylaws. Pursuant to Bylaw 19.01.2, "The [NCAA] infractions program shall hold institutions, coaches, administrators, other representatives and student-athletes who violate NCAA bylaws accountable for their conduct." Penalties include fines, scholarship reductions, postseason bans, and even the "death penalty" mentioned above.

## V.   RELEVANT MARKETS

90.   The relevant markets are the nationwide markets for the labor of NCAA Division I

---

[48] Southeastern Conference Constitution and Bylaws, 2023–2024, https://a.espncdn.com/sec/media/2023/2023-24%20SEC%20Bylaws.pdf (last visited Nov. 26, 2023).

[49] *Id.*

college athletes in the various sports in which they compete. In these labor markets, current and prospective athletes compete for roster spots on the various Division I athletic teams. NCAA Division I member institutions compete to recruit and retain the best players by offering unique bundles of goods and services including scholarships to cover the cost of attendance, education-related benefits and awards, as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange, athletes provide their athletic services and maintain minimum academic achievements.

91.     All of the colleges and universities in Division I, which the NCAA itself defines as the highest level of competition in college sports, compete in the relevant labor markets for each sport in which the institution fields a varsity team. For decades, NCAA institutions have fiercely competed with each other for the services of athletes, but only within the confines of the rules that prohibit any financial compensation to athletes beyond the price-fixed limits set by the NCAA and its conferences.

92.     The demand for college athletes' services is greater than ever (and still growing). Competitor institutions boast of their continued athletic success and notable alumni who play or have played professionally or on a world stage. Coaches bombard prospective college athletes with handwritten letters, sometimes sending dozens in a single day. And Power Five Conference schools are in an "arms race" to capture recruits by spending lavishly on seemingly everything but athlete compensation, including expanded stadiums and arenas, luxury locker rooms and training facilities, high-end dorms, and specialized tutoring centers. The Conference-Defendant schools also spend millions of dollars on coaches and athletic directors, while prohibiting athletes from receiving non-education-related remuneration beyond the limited amounts permitted by NCAA rules.

93.     Since July 2021, when the NCAA temporarily suspended most of its restrictions in the relevant labor markets on athletes' ability to earn compensation from third parties (but not from the NCAA, conferences or NCAA member schools) in exchange for the use of athletes'

-29-

NILs, colleges and universities have competed to provide resources, support, and earning potential for athletes' NIL endeavors. For example, in July 2022, Alabama Football Coach Nick Saban boasted that Alabama football players earned a combined $3 million in NIL compensation.[50] But there has been no similar suspension of the NCAA's rules prohibiting "pay-for-play" compensation in the relevant labor markets. Indeed, even with respect to permitted NIL payments, the NCAA rules continue to prohibit any NIL payments based on the athletic performance of athletes.[51]

94.     As monopsony buyers in the relevant labor markets, the NCAA and its members have the market power to control prices and exclude competition. All NCAA members agree to abide by the NCAA's "pay-for-play" rules, which are used by the NCAA and its members to fix the prices college athletes can be paid for their athletic services. The NCAA and its members further have the monopsony power to exclude from the relevant markets any school or conference that violates the NCAA's rules.

95.     The NCAA imposes a wide variety of restraints on athletes as a condition for their being able to play for a Division I team. For example, athletes are prohibited from receiving compensation from the NCAA, conferences, or their schools beyond educational expenses and benefits approved by the NCAA; are required to meet minimum benchmarks for educational progress; and are strictly limited in their ability to receive compensation from any source for services that might be understood to be in exchange for their athletic ability or performance. If athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, most would choose to do so. The fact that they agree to these conditions illustrates the market power of the NCAA, Conference Defendants and their members in each of the relevant labor markets for Division I athletes.

---

[50] Zach Koons, *Nick Saban Claims Alabama Players Made $3 Million from NIL Last Year*, Sports Illustrated (July 19, 2022), https://www.si.com/college/2022/07/19/nick-saban-how-much-alabama-players-made-from-nil-last-year-sec-media-days.

[51] *See Name, Image and Likeness Policy: Question and Answer*, NCAA (Feb. 2023), https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (last visited Nov. 27, 2023) ("[A]thletic performance may not be the 'consideration' for NIL compensation.").

96.     There are no reasonable substitutes for the educational and athletic opportunities offered by NCAA Division I schools in the relevant labor markets. No other division or association of collegiate athletics provides the same combination of goods and services offered in Division I. Schools in NCAA Division II, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition, and much lower notoriety. Schools in NCAA Division III do not provide any athletic scholarships at all and offer an even lower level of competition.

97.     The National Association of Intercollegiate Athletics (NAIA), National Junior College Athletic Association (NJCAA), and United States Collegiate Athletic Association (USCAA) likewise provide less scholarship money and offer a much lower level of competition. And schools in these other divisions and associations are often smaller than Division I schools, spend far less resources on athletics, and many do not even provide the opportunity to attend a four-year college.

98.     Nor are equivalent labor market opportunities offered by the professional leagues. For example, the National Football League (NFL), the National Basketball Association (NBA) and the Women's National Basketball Association (WNBA) prohibit players from entering the league immediately after high school. And, although some minor leagues and professional leagues in other sports (to the extent that there are such leagues in a given sport) do permit athletes to compete immediately after high school, recruits rarely forego opportunities to play Division I sports in order to play professionally because of the unique combination of opportunities which only Division I schools can offer. The qualitative differences between the opportunities offered in NCAA Division I, including the opportunity to receive a college education, and those offered by other sports leagues demonstrate that Division I schools operate in distinct labor markets for their athletes.

99.     The same goes for upstart leagues like Overtime Elite. While Overtime Elite offers top basketball prospects the chance to earn salaries while getting an education, it is not an economic substitute for Division I men's basketball. For one, it is only available to the "next

-31-

generation of all-star athletes," meaning that it is far less accessible to most basketball athletes.[52] It also lacks the storied history of NCAA Division I men's basketball (having been founded in 2021), and cannot offer the multi-generational alumni fanbases or support or equivalent national media exposure that make NCAA Division I athletics unique.[53] And Overtime Elite allows athletes to choose to forego salaries so that they can preserve their NCAA eligibility.[54] This unequivocally shows that Overtime Elite is not interchangeable with Division I basketball.

100. Because Division I schools are the only suppliers in the relevant labor markets, they have the power, when acting in concert through the NCAA and its conferences, to fix the price of labor. They exercise this monopsony power by enacting collectively agreed-to, horizontal rules that strictly limit the compensation and terms of employment for Division I athletes. If any school sought to depart from these fixed employment terms, by, for example, offering their athletes a share of the school's revenues in exchange for their athletic contributions, the school would face severe sanctions by the NCAA and the athletes who received the payments would lose their NCAA eligibility.

101. The economic harm to Division I athletes from the NCAA's pay-for-play restraints in the relevant labor markets is indisputable. College athletes in Division I have made substantial economic contributions to their schools and conferences through their athletic abilities. They have driven schools' and conferences' broadcast, sponsorship and ticket revenues and have increased the brand value of their schools, which has led to significant monetary donations from alumni and others. Absent the challenged restraints, in competitive labor markets, Division I college athletes would be paid more and receive more benefits for their services as athletes than they have been

---

[52] *About OTE*, Overtime Sports, Inc. (2023), https://overtimeelite.com/about/story (last visited Nov. 24, 2023).

[53] *See* Kevin Draper, *A New League's Shot at the N.C.A.A.: $100,000 Salaries for High School Players*, N.Y. Times (Mar. 4, 2021), https://www.nytimes.com/2021/03/04/sports/basketball/overtime-league-high-school-pay.html.

[54] *See* Kyle Tucker, *Top 2024 Recruit Naasir Cunningham Signs With Overtime Elite, Plans to Maintain College Eligibility*, The Athletic (Apr. 25, 2022), https://theathletic.com/3500265/2022/04/25/top-2024-recruit-naasir-cunningham-signs-with-overtime-elite-plans-to-maintain-college-eligibility/?redirected=1&source=googlesearch&access_token=13151038 (last visited Nov. 29, 2023).

-32-

able to receive in the labor markets that Defendants have severely constrained. Moreover, many athletes have grown up in socioeconomically disadvantaged circumstances and being deprived of opportunities to earn compensation has had particularly devastating effects on them and their communities. All of the Division I athletes have been denied the opportunity to pursue economic benefits in a competitive market free of the NCAA's restraints. This antitrust injury to the class is exacerbated by the reality that only a small percentage of college athletes ever play professionally. And even those that do play professionally often have very short careers. For most athletes, college is where the value of their athletic skill is at its peak and the best chance they have to realize that value. But the Defendants' anticompetitive restraints prohibit them from doing so.

## VI.     HISTORY OF THE NCAA AND ITS ANTICOMPETITIVE RESTRAINTS ON ATHLETE COMPENSATION

### A.     An Overview of the NCAA

#### 1.     History and Purpose

102.    Former NCAA Executive Director Walter Byers, in his 1995 book, *Unsportsmanlike Conduct: Exploiting College Athletes*, wrote: "[t]he first intercollegiate competition in the United States was conceived and organized by students in the mid-1840s. By the turn of the century, eastern colleges were competing in some 19 sports. This all came about through student initiative and effort. The students set in place the underlying structure for college sports. Today, professional coaches, professional managers and money-minded presidents have total control. It is time to give back to the students who play sports the freedoms they deserve. At a minimum, they are entitled to freedoms enjoyed by their fellow students."

103.    The NCAA states that it "was founded in 1906 to protect young people from the dangerous and exploitative athletics practices of the time."[55] According to the NCAA, "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White

---

[55] Dan Treadway, *Why Does the NCAA Exist?* HuffPost.com, Dec. 6, 2017, https://www.huffpost.com/entry/johnny-manziel-ncaa-eligibility_b_3020985 (last visited July 25, 2021).

-33-

House conferences with college athletics leaders to encourage safety reforms. As a result of several subsequent meetings of colleges and universities to initiate changes in football playing rules to protect the safety of student-athletes, on March 31, 1906, 62 institutions became charter members of the Intercollegiate Athletic Association of the United States ("IAAUS"). The IAAUS took its present name, the NCAA, in 1910.

104. For several years, the NCAA was a discussion group and rules-making body, but in 1921 the first NCAA national championship was conducted: the National Collegiate Track and Field Championships. Gradually, more rules committees were formed and more championships were created, including a basketball championship in 1939.

105. Despite its stated "good" intentions, the NCAA soon evolved into an economic cartel, whose prime directive was to limit the compensation paid to college athletes so that the schools and conferences could keep the revenues from college sports for themselves. In 1948, the NCAA passed the "Sanity Code," which prohibited *any* form of merit-based pay to college athletes, with violators running the risk of one punishment: expulsion. With prominent schools running afoul of the Sanity Code—by offering athletic scholarships that are, of course, permissible today—the NCAA repealed the Sanity Code in 1951, replaced it with new rules prohibiting compensation to college athletes, and introduced the Committee on Infractions which was given broader punitive leeway to enforce compensation restraints and continues to exist today.[56]

106. According to the NCAA, "[a]s college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis. In 1973, the Association's membership was divided into three legislative and competitive divisions—I, II and III. Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007)." The NCAA "began administering women's athletics programs in 1980 when Divisions II and III established 10 championships for 1981-82."

---

[56] Rodney K. Smith, A Brief History of the National Collegiate Athletic Association's Role in Regulating Intercollegiate Athletics, 11 Marquette Sports L. Rev. 9, 15 (2000).

107.     Bylaw 12.01.2 ("Clear Line of Demarcation") claims that "[m]ember institutions' athletics programs are designed to be an integral part of the educational program," and that "[t]he student-athlete is considered an integral part of the student body, thus maintaining a clear line of demarcation between college athletics and professional sports." But this has not matched reality. As the revenues of Division I athletics have exploded, the NCAA has enforced its labor-market cartel rules to exploit college athletes, whose primary job has been to devote time and efforts equivalent to a full-time job to their sports teams, without regard for integration into their broader university communities.

### 2.     Governance Structure

108.     The NCAA describes itself as an "unincorporated not-for-profit educational organization . . . through which the colleges and universities of the nation speak and act on athletic matters at the national level."[57] The NCAA proclaims it is "a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases," and that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character." According to its IRS tax returns, the NCAA's "active member institutions and voting conferences are the ultimate voice in all Association decisions."[58]

109.     The NCAA "oversees 89 championships in 23 sports," and "more than 400,000 college athletes competing in three divisions at over 1,000 colleges and universities." The NCAA website further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).

> There are 1,066 active member schools in the NCAA membership— 340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions.

---

[57] NCAA Consolidated Financial Statements, FY 2018 & 2019.

[58] 2018 IRS Form 990.

-35-

1

Overall membership—counting schools, conferences and related associations—is 1,273.

2

Division I is subdivided based on football affiliation. A total of 120 schools are members of the Football Bowl Subdivision (FBS). That subdivision is characterized by postseason play outside the NCAA structure and also by higher financial aid allocations. The second Division I subdivision is the Football Championship Subdivision, which contains 122 schools that participate in the NCAA's Division I Football Championship. The remaining 98 Division I schools do not sponsor football.

3

4

5

6

110.    According to the NCAA, "Division I offers three classes of membership: active, conference and affiliated." NCAA Bylaw 20.02.3 titled "Membership Categories," provides:

7

8

9

**Active Member.** An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Bylaw 20.2). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association.

10

11

12

**Member Conference.** A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Bylaw 20.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Bylaw 20.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Bylaws 20.02.1 and 20.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

13

14

15

16

17

18

19

111.    The NCAA's website explains that, "[e]ach division creates its own rules

20

governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and

21

practice seasons—consistent with the overall governing principles of the Association. Every

22

program must affiliate its core program with one of the three divisions."

23

112.    The NCAA "operates through a governance structure, which empowers each

24

division to guide and enhance their ongoing division-specific activities."[59] In Division I, the

25

legislative system is based on conference representation and an 18-member Board of Directors

26

that approves legislation. The governance structure also includes an Executive Committee,

27

---

28

[59] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

composed of 16 chief executive officers, that oversees association-wide issues and is charged with ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA. Through this governance structure, the NCAA has adopted and enforced the anticompetitive labor-market rules that prohibit "pay-for-play" challenged in this action.

### 3. Bylaws and Enforcement

113. The NCAA and its members govern themselves through the NCAA Manual, which is promulgated yearly and updated quarterly. The manual contains, among other things, the NCAA's Constitution and operating Bylaws, which includes nearly 500 pages of regulations governing all aspects of college sports.

114. The Constitution and Bylaws were adopted—and may be amended—by votes of the NCAA membership. As indicated by the Manual's "Voting Requirements For Manual" the Constitution requires a two-thirds majority vote of the total membership for adoption or amendment. And the "Operating Bylaws" are adopted or amended based on varying voting requirements of certain members, but all Operating Bylaws "consist of legislation adopted by the membership to promote the principles enunciated in the constitution and to achieve the Association's purposes."

115. The Manual also contains extensive provisions requiring member schools to follow NCAA rules and providing for discipline of members that fail to do so. For example, Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference, divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program." And Bylaw 8.01.3 ("Responsibility to Monitor and Report") reiterates that "[a]n institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of

-37-

1    an institution's staff, student-athletes, and other individuals and groups representing the

2    institution's athletics interests shall comply with the applicable Association rules . . . and the

3    member institution shall be responsible for such compliance."

4          116.    Bylaw 20.1.1 ("Eligibility for Membership") reinforces that "institutions or

5    organizations must accept and observe the principles set forth in the [NCAA] bylaws." And

6    Bylaw 20.2.1.2 ("Compliance with Association Rules") mandates that each institution "shall

7    administer its athletics programs in accordance with the bylaws."

8          117.    Similarly, Bylaw 20.2.4.1 ("Conditions and Obligations of Membership –

9    General") states that "[a]n active member institution agrees to administer its athletics program in

10   accordance with the bylaws." And, pursuant to Bylaw 20.2.4.4 ("Certification of

11   Eligibility/Declaration of Ineligibility"), every NCAA school "is responsible for certifying the

12   eligibility of student-athletes under the terms of the bylaws," and institutions are "obligated

13   immediately to apply all applicable rules and withhold ineligible student-athletes from all

14   intercollegiate competition." In other words, the NCAA rules mandate a collective boycott by all

15   members against any athlete found to have accepted compensation beyond Defendants' price-

16   fixed limits.

17         118.    Bylaw 20.2.4.11 ("Discipline of Members") states that, "an active member

18   institution shall refrain from athletics competition with designated institutions as required under

19   the provisions of the Association's infractions process."

20         119.    Defendants also enforce their anticompetitive restraints by punishing colleges and

21   universities for non-compliance. Bylaw 20.10.1.5 ("The Commitment to Institutional Control and

22   Compliance") states that "[u]pon a conclusion that one or more violations occurred, an institution

23   shall be subject to such disciplinary and corrective actions as may be prescribed by the [NCAA]

24   on behalf of the entire membership." Bylaw 20.2.5.1 ("Termination or Suspension") states that

25   "[t]he membership of any active member . . . failing to meet the conditions and obligations of

26   membership may be suspended, terminated or otherwise disciplined . . . ." Bylaw 20.01.5

27   ("Termination or Suspension of Membership") states that "[a]ll rights and privileges of a member

28

1   shall cease immediately upon termination or suspension of its membership." And Bylaw

2   20.2.5.1.1 ("Cessation of Rights and Privileges") states that "[a]ll rights and privileges of the

3   member shall cease upon any termination or suspension of active membership."

4   **B.      The NCAA's History of Antitrust Violations**

5          120.    This lawsuit is another chapter in the NCAA's long history of federal antitrust

6   violations. Over the years, various groups have successfully brought antitrust cases against the

7   NCAA challenging its anticompetitive rules. Time and time again, the NCAA and its members

8   have defended their restraints based on the fictious concept of "amateurism" and the false claim

9   that the loosening of compensation and benefit restraints would destroy consumer demand for

10  college sports. History shows that these arguments are nothing more than *ipse dixit*: the courts

11  have repeatedly forced the NCAA and Conference Defendants to loosen their restraints, and

12  consumer demand for college sports has continued to grow. Stated differently: the health of

13  college sports and the fair treatment of college athletes in competitive labor markets are not

14  mutually exclusive.

15         121.    In 1984, the United States Supreme Court ruled in *NCAA v. Board of Regents* that

16  the NCAA violated Section 1 of the Sherman Act by limiting the number of live televised football

17  games and prohibiting conferences and schools from entering into competing broadcast

18  agreements with other networks to televise more games. At the Supreme Court, the NCAA

19  decried schools freely competing to sell their broadcast rights for football games, claiming that

20  such activity would pose an existential threat to amateurism and consumer demand. But the Court

21  held that the NCAA's anticompetitive scheme unlawfully restrained the market for live

22  broadcasts of college football games and struck down its anticompetitive rules prohibiting such

23  competition.[60] Since then, conferences and schools have freely engaged in such competition and

24  generated billions of dollars in revenues as a result, with no harm to consumer demand. Rather,

25  consumers have benefitted significantly—the expanded output of football broadcasts has allowed

26  fans of every Power Five school to watch all or virtually all of their teams' football games.

27  _____

28         [60] *Board of Regents*, 468 U.S. at 119 (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

1       122.    In *Law v. NCAA*, the Tenth Circuit affirmed a summary judgment ruling, which

2   held that the NCAA's rule capping assistant basketball coaches' annual salaries at $16,000 per

3   year was an unlawful restraint of trade. The NCAA opposed allowing schools to freely compete,

4   claiming that it would damage the collegiate model of amateurism. The Tenth Circuit held that

5   the horizontal agreement to fix compensation was presumptively anticompetitive, and that the

6   NCAA had failed to present even a triable issue concerning whether the salary restraint was

7   procompetitive.[61] This rule no longer exists, competition for assistant basketball coaches' salaries

8   is unrestrained, these coaches often earn *millions*,[62] and consumer demand for Division I

9   basketball flourishes.

10      123.    In *White v. NCAA*, the NCAA argued against allowing schools to freely compete

11  by offering COA scholarships, calling such scholarships "pay-for-play."[63] Today this competition

12  is unrestrained, both full COA scholarships and certain limited types of payments *above* COA are

13  ubiquitous, and consumer demand for college sports continues to grow.

14      124.    In 2009, a group of Division I men's basketball and football athletes brought an

15  antitrust class action—*O'Bannon v. NCAA*—challenging NCAA rules that prevent athletes from

16  receiving a share of the revenues that the NCAA and its members derive from the use of athletes'

17  NIL in live game broadcasts, related footage, and video games.[64] The NCAA and the Conference

18  Defendants argued that permitting any additional compensation or benefits to the athletes,

19  including full COA scholarships, would destroy consumer demand for college sports.[65] The

20  district court rejected these arguments and held that the challenged rules were more restrictive

21  than necessary to achieve any legitimate procompetitive justification and thus violated the

22

23      [61] *Law*, 134 F.3d at 1021 (rejecting NCAA's proposed procompetitive justifications for
24  restricting assistant coach salaries).

        [62] For example, between 2009 and 2015, assistant men's basketball coaches' salaries
25  increased by nearly 40 percent.

26      [63] *See* NCAA Memo. P&A in Support. Summ. J. 28, *White v. NCAA*, No. 06-cv-99 (C.D. Cal.
    Oct. 22, 2007), ECF No. 220.

27      [64] *O'Bannon*, 7 F. Supp. 3d at 962–63.

28      [65] *Id.* at 973.

antitrust laws.[66] The district court enjoined the NCAA from prohibiting its schools from directly paying athletes (i) full COA scholarships and (ii) $5,000 per year in deferred compensation for the game-related use of their NIL, through trust funds distributable after the athletes leave school.[67] The Ninth Circuit affirmed the liability finding and COA portion of the remedy, but held that on the record before the district court, plaintiffs had not shown that allowing $5,000 payments directly from schools in deferred compensation for game-related NIL usage would be virtually as effective as the existing restraints at preserving "amateurism"—and thus consumer demand for college sports.[68]

125.    After the *O'Bannon* decision—and based on new evidence and factual developments—the district court in *In re Athletic Grant-in-Aid Cap Antitrust Litigation* ("*Grant-in-Aid Cap*") found (and the Ninth Circuit and a unanimous Supreme Court later agreed) that the NCAA's compensation rules "'do not follow any coherent definition of amateurism.'"[69] The district court, applying the rule of reason, found that those rules were more restrictive than reasonably necessary, to the extent they prohibited the payment of education related benefits.[70] However, at that time, the district court did not find that it had been shown that the NCAA's other compensation restraints were more restrictive than reasonably necessary. Subsequent factual developments have shown that these restraints can no longer be justified.

126.    The Ninth Circuit affirmed the district court's holding in *Grant-in-Aid Cap* that the NCAA's compensation restraints, insofar as they prohibited education-related compensation and benefits, violated Section 1 of the Sherman Act.[71] The Ninth Circuit underscored that "[a]ntitrust decisions are particularly fact-bound"—the "Rule of Reason contemplate[s] case-by-case analysis" that is "inherently fact-dependent" and "evaluates dynamic market conditions and

---

[66] *Id.* at 982–84, 1005–07.

[67] *Id.* at 1007–08.

[68] 802 F.3d 1049, 1072–79 (9th Cir. 2015).

[69] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d at 1249 (quoting and affirming 375 F. Supp. 3d 1058, 1074 (N.D. Cal. 2019)).

[70] 375 F. Supp. 3d at 1109.

[71] *See* 958 F.3d 1239.

-41-

1  consumer preferences—and stressed that "courts must continue to subject NCAA rules, including

2  those governing compensation, to antitrust scrutiny."[72]

3  **C.      The Supreme Court's *Alston* decision**

4        127.    In *NCAA v. Alston*, decided on June 21, 2021, the Supreme Court reviewed the

5  Ninth Circuit's decision in *Grant-in Aid Cap* and unanimously affirmed it in full.[73] Rejecting

6  Defendants' arguments, the Supreme Court held that the NCAA's compensation rules are subject

7  to the same Sherman Act analysis as other businesses, emphasizing that the "NCAA *accepts* that

8  its members collectively enjoy monopsony power in the market for student-athlete services, such

9  that its restraints can (and in fact do) harm competition."[74] Further, the Supreme Court affirmed

10 the lower courts' application of the rule of reason, finding that the NCAA's restraints on

11 education-related compensation and benefits violated Section 1 of the Sherman Act.[75] Today, as a

12 result of *Alston*, many college athletes —particularly at P5-Conference schools—regularly

13 receive education-related benefits in excess of full COA scholarships, and consumer demand for

14 college sports has continued to grow exponentially.

15       128.    In a concurring opinion in *Alston*, Justice Kavanaugh stated that the NCAA's

16 "current compensation regime raises serious questions under the antitrust laws," and that its

17 broader compensation rules (*i.e.*, those that were *not* before the Supreme Court in *Alston* but are

18 challenged here) "may lack" a legally valid procompetitive justification. As he stated: "the

19 NCAA is not above the law."[76]

20       129.    This Complaint builds on the observations of Justice Kavanaugh. The market

21 realities and new facts following the trial in *In re Grant-in-Aid Cap* show that the NCAA's pay-

22 for-play restraints can no longer be justified and must finally be struck down in their entirety as

23 violations of Section 1 of the Sherman Act.

24

25       [72] *Id.* at 1253.

26       [73] *Alston*, 141 S. Ct. 2141 (2021).

         [74] *Id.* at 2156 (emphasis in original).

27       [75] *Id.* at 2155–60, 2166.

28       [76] *Id.* at 2166–69 (Kavanaugh, J., concurring).

-42-

**D.** *In re College Athlete NIL Antitrust Litigation*

130.    While *Alston* was proceeding, several states enacted laws that would allow college athletes within their jurisdictions to earn compensation from third parties for their NILs. And the NCAA and many of its conferences and member-institutions began supporting the idea of third-party compensation for college athletes' NIL, but still did not act to change their rules prohibiting NIL compensation. It was not until the Supreme Court's decision in *Alston* that the NCAA finally concluded that it would suspend most of its restraints on NIL payments from third parties, while maintaining its restraints on any NIL payments from conferences or schools, including for the use of athletes' NILs in broadcasts.

131.    In the summer of 2020, before the NCAA belatedly and partially changed its NIL restraints, counsel for the Proposed Classes in this litigation filed *House v. NCAA* (now consolidated with *Oliver v. NCAA* as *In re College Athlete NIL Litigation*), challenging Defendants' rules that prohibit or restrict the compensation athletes can receive for the commercial use of their NILs.[77] Plaintiffs filed a consolidated amended complaint after the NCAA suspended most of its third-party NIL rules, which, among other things, pointed out that permitting such NIL payments had not damaged consumer demand for college sports in any way.[78]

132.    On September 22, 2023, the Court granted the *In re College Athlete NIL Litigation* plaintiffs' motion for certification of an injunctive relief class.[79] And on November 3, 2023, the Court granted plaintiffs' motion for certification of three damages classes.[80] However, that case only challenges the Defendants' NIL restraints. It does not challenge the "pay-for-play" restraints

---

[77] Complaint, *House v. NCAA*, No. 4:20-cv-03919-CW (N.D. Cal. June 15, 2020), ECF No. 1; Complaint, *Oliver v. NCAA*, No. 4:20-cv-04527-CW (N.D. Cal. July 8, 2020), ECF No. 1; Order Granting Joint Stipulation Consolidating *House* and *Oliver* Actions, *In re College Athlete NIL Litig.*, No. 4:20-cv-03919-CW (N.D. Cal. July 15, 2021), ECF No. 154.

[78] Consolidated Amended Complaint, *In re College Athlete NIL Litig.*, No. 4:20-cv-03919-CW (N.D. Cal. July 26, 2021), ECF No. 164.

[79] Order Granting Motion for Certification Injunctive Relief Class, *In re College Athlete NIL Litig.*, No. 4:20-cv-03919-CW (N.D. Cal. Sept. 22, 2023), ECF No. 387.

[80] Order Granting Motion for Certification of Damages Classes, *In re College Athlete NIL Litig.*, No. 4:20-cv-03919-CW (N.D. Cal. Nov. 3, 2023), ECF No. 387.

1   at issue in this litigation.

2   **E.**   **The challenged pay-for-play restraints are not necessary to serve any legally valid procompetitive purpose.**

3

4        **1.**   **The evidence since the *In re Grant-in-Aid Cap* trial demonstrates that defendants' amateurism justification has no remaining factual support.**

5       133.   Whatever doubt there may have been about the validity of Defendants' amateurism

6   justification in 2019, when the *Grant-in-Aid Cap* trial was conducted, ensuing market realities

7   and new factual developments show that "amateurism" is no longer a legitimate procompetitive

8   justification for any of the Defendants' pay-for-play restraints. Specifically, despite the ubiquitous

9   payment of "*Alston* benefits," the continuation and expansion of full-COA scholarships and

10   payments, and substantial and unlimited NIL payments from third parties, there has been no

11   adverse effect on consumer demand for Division I college sports. To the contrary, the NCAA

12   concedes that these payments and benefits to college athletes have not had any adverse impact on

13   consumer demand.

14       134.   In fact, since the NCAA has allowed these benefits and compensation, television

15   ratings and revenues (broadcast and otherwise) for Division I college sports have increased

16   exponentially. Accordingly, a number of NCAA and Conference officials have since admitted

17   that amateurism is no longer a justification for their restraints.

18       135.   In May 2022, *The Washington Post* and the University of Maryland conducted a

19   poll in which 88% of 1,503 respondents said that allowing athletes to receive NIL compensation

20   either "hasn't made a difference" or had a "positive impact" on their enjoyment of college

21   sports.[81]

22       136.   And, as noted earlier, a recent study by Playfly Insights showed that television

23   ratings and game attendance are higher than ever: "Before 2021, the NCAA argued that any form

24   of payment to amateur athletes, from NIL and revenue sharing to employment status, would have

25   a negative impact on fan interest in college athletics. Since athletes started earning off their name

26

27         [81] Emily Giambalvo, Scott Clement, and Emily Guskin, *NIL hasn't made a difference for most in enjoyment of college sports, poll finds*, The Washington Post (June 30, 2022),

28   https://www.washingtonpost.com/sports/2022/06/30/nil-college-sports-fans-poll/.

CLASS ACTION COMPLAINT                          Case No. 4:23-cv-6325
011210-11/2405961 V1

and image, viewership and attendance data for several sports have proven that assumption is incorrect."[82]



137.    According to the study, television viewership for college football increased by nearly 15% over the first seven weeks of the 2023 season compared to the same period last year.[83] The same study also revealed that the 2022 season saw the highest overall college football attendance since 2016 and a 5% increase from 2021. According to the report: "college football easily draws more fans than the NFL. For perspective, 42.3 million fans turned out for the 2022 regular season—more than double the annual attendance of the NFL (18.5 million)."[84]

---

[82]    Playfly Fanscore, College Football Edition 2023 (November 20, 2023), https://playfly.com/fan-score/; *see also* Press Release, Playfly Sports, Leaders in Sports Fan Data, Release Latest Playfly Fan Score: College Football Edition (November 20, 2023), https://playfly.com/press-releases/playfly-sports-leaders-in-sports-fan-data-release-latest-playfly-fan-score-college-football-edition/.

[83]    *Id.*

[84]    *Id.*



138.     The NCAA brought in a record $ 1.16 billion in revenues in 2021.[85] Last year, the Power Five Conferences brought in more than $3.3 billion in total revenues.[86] And of the 52 public Power Five schools, only 12 reported less than $100 million in annual revenue during the

---

[85] Eben Novy-Williams, *March Madness Daily: The NCAA's Billion-Dollar Cash Cow*, (March 26, 2022), https://www.sportico.com/leagues/college-sports/2022/march-madness-daily-the-ncaas-billion-dollar-cash-cow-1234668823/.

[86] Dean Straka, *Big Ten leads Power Five conferences with $845.6 million in revenue in 2022 fiscal year, per report*, CBS (May 19, 2023), https://www.cbssports.com/college-football/news/big-ten-leads-power-five-conferences-with-845-6-million-in-revenue-in-2022-fiscal-year-per-report/.

1   2019 fiscal year—5 of those 12 brought in more than $95 million.

2        139.   A substantial portion of this money is generated through the NCAA and the

3   Conferences' lucrative media contracts with broadcasters, including deals signed after the NCAA

4   changed its NIL rules in July 2021. This demonstrates that media companies do not believe that

5   athletes receiving additional compensation beyond the value of a grant-in-aid scholarship will

6   harm consumer demand for college sports. In 2022, the Big Ten announced that it had finalized

7   new broadcast agreements that will generate more than $1 billion *per year* through the 2029-2030

8   academic year.[87] The Big 12 also secured a six-year, $2.3 billion extension of its current media

9   rights deal with Fox Sports and ESPN, which now runs through 2031.[88] And the SEC has a

10  current deal with ESPN that will pay the conference $3 billion over its 10-year term.[89]

11       140.   In addition to the conference-level broadcast deals, ESPN's current contract with

12  the College Football Playoff pays out approximately $470 million per year to the FBS

13  conferences. And when that contract is up for renegotiation in 2026, analysts predict that

14  revenues from the CFP will grow to over $2 billion per year.[90] Indeed, a recent report by the

15  Knight Commission on Intercollegiate Athletes projects that within 10 years, the 54 public Power

16  Five athletic programs will alone generate $16.7 billion in revenue annually (largely due to

17  increased broadcast revenues), and that spending on football coaches by these public institutions

18  ($1.363 billion) would nearly equal spending on athletic scholarships and medical expenses for

19

20  _____

21       [87] Adam Rittenberg, *Big Ten completes 7-year, $7 billion media rights agreement with Fox, CBS, NBC*, ESPN (August 18, 2022), https://www.espn.com/college-football/story/_/id/34417911/big-ten-completes-7-year-7-billion-media-rights-agreement-fox-cbs-nbc.

22       [88] Dean Straka, *Big Ten leads Power Five conferences with $845.6 million in revenue in 2022 fiscal year, per report*, CBS (May 19, 2023), https://www.cbssports.com/college-football/news/big-ten-leads-power-five-conferences-with-845-6-million-in-revenue-in-2022-fiscal-year-per-report/.

23

24

25       [89] Sam Carp, *SEC leaving CBS for ESPN in US$3bn deal from 2024*, SportsPro Media (December 11, 2020) https://www.sportspromedia.com/news/sec-espn-abc-football-tv-rights-cbs/?zephr_sso_ott=6wc9Bz.

26

27       [90] Raph D. Russo, *CFP expansion could increase annual revenue to $2 billion*, AP News (June 11, 2021), https://apnews.com/article/college-sports-football-business-entertainment-college-football-e2e2beb24fac0b8782b96e841cfb9b40.

28

1   all athletes across all sports at those same schools ($1.372 billion).[91]

2        141.    These new market facts demonstrate that it is no longer possible for the NCAA to

3   defend its pay-for-play restraints based on the purported need to preserve "amateurism" to

4   maintain the consumer demand for college sports.

5        142.    Indeed, Division I college athletes play in lavish practice facilities and stadiums

6   costing hundreds of millions of dollars that are filled with brand logos—endorsements of

7   companies that compensate their colleges—and they compete on national television in uniforms

8   and shoes licensed by their schools, and where broadcasters air commercials for sponsors every

9   few minutes. Given this massive and ever-increasing commercialization of college sports (billions

10   in revenue, and exorbitant spending on facilities and salaries for coaches and other NCAA,

11   Conference and school officials), the notion that compensating athletes for their athletic

12   performance would decrease consumer demand by "revealing" that college sports is a commercial

13   business, defies credibility.

14        143.    The recent announcements about upcoming conference realignment by Power Five

15   schools only further highlights that NCAA actors are no longer even pretending that anything

16   matters to them but maximizing revenues. For example, all but two Pac-12 schools have

17   announced moves to other P5 Conferences that generate more broadcasting revenues than the

18   Pac-12. They are making these moves despite the adverse impact their decisions will have on

19   college athletes, who will have to endure even more cross-country travel and other long-distance

20   commitments. These decisions undermine any pretense that NCAA member institutions prioritize

21   college athletes' academic pursuits over their athletic-team obligations.

22        144.    These new market realities make it undeniable that Division I college sports is a

23   big business that is the opposite of an "amateur" school activity. As Michigan football coach Jim

24   Harbaugh aptly observed: "When student-athletes call it a game, corporate-types call it a

25

26

27      [91]   Financial   Projections   Through   2032   For   Division   I   FBS   Programs,
https://www.knightcommission.org/wp-content/uploads/2023/09/cla_financial_projections_

28   report_2023.pdf, at p. 2.

business. When the student-athletes call it a business, the corporate-types call it a game."[92]

145.    Even former NCAA President, Mark Emmert, has recently advocated for a new model that would compensate college athletes directly for the value that they contribute to their universities. In a 2022 interview, Emmert openly acknowledged that college athletes contribute immensely to the value of their school brands and said that "[s]chools don't have sports programs because they're philanthropic. They have them because they're important to the school, to the community, to the brand building of the school, to the recruitment strategy of the school." Given this reality, Emmert said: "I think that especially with the size of media contracts that are being created right now, there needs to be recognition of the brand building value, for the school itself, of the athletes."[93]

146.    In 2022, after the Big Ten Conference announced that it had secured a new 7-year contract with Fox, CBS and NBC worth more than $7 billion then-Commissioner Kevin Warren stated that he could "foresee paying [Big Ten] athletes."[94]

147.    In July 2022, Michigan football coach Harbaugh went on record again saying: "I believe players should have a share in the revenues, and I think that's something that's really possible at Michigan. I think that's where we're headed."[95] Indeed, in 2018, Michigan's television rights revenue grew by 392% to $51,000,000. And when the Big Ten's new media deal takes effect next season (in 2024–2025), Michigan and all other Big Ten member schools are estimated

[92] Ralph D. Russo, *Revenue-sharing with major college football players seems 'inevitable.' How could it be done?*, AP News (September 12, 2023), https://apnews.com/article/college-athletes-revenue-sharing-726b9a5a8aa9a28575fe8001ee19582d.

[93] Kristi Dosh, *The Future of NIL and Compensating Athletes with NCAA President Mark Emmert*, Business of College Sports (September 10, 2022), https://businessofcollegesports.com/name-image-likeness/the-future-of-nil-and-compensating-athletes-with-ncaa-president-mark-emmert/.

[94] David Jones, *Kevin Warren to Bryant Gumbel: Paying players and expansion to 20 schools on Big Ten agenda | Jones*, (August 19, 2022), https://www.pennlive.com/pennstatefootball/2022/08/kevin-warren-to-bryant-gumbel-paying-players-and-expansion-to-20-schools-are-on-big-ten-table-jones.html.

[95] Aaron McMann, *Jim Harbaugh wants Big Ten to share TV rights revenue with players*, M Live (July 26, 2022), https://www.mlive.com/wolverines/2022/07/jim-harbaugh-wants-big-ten-to-share-tv-rights-revenue-with-players.html#:~:text=%E2%80%9CYou%20know%20me%2C%20I',where%20we're%20headed.%E2%80%9D.

1   to net nearly $100,000,000 annually from the broadcasts.[96]

2       148.    And, NCAA President, Charlie Baker recently sent a letter to NCAA member

3   schools proposing what he called a "forward-looking framework" that would allow all Division I

4   schools to make unlimited educational benefits and direct NIL payments available to their

5   athletes.[97] Within days, at the Sports Business Journal Intercollegiate Forum ("SBJ Forum") on

6   December 6, 2023, President Baker publicly confirmed that he does "not want to limit

7   compensation for athletes at all" and that the proposal is an approach to the "elephant in the

8   room" of how to support college athletes at the most highly resourced institutions. To that end,

9   Baker's proposal suggests a new subdivision within Division I of the schools with the highest

10  revenues which would require payments of at least $30,000 per year per athlete for at least half

11  the schools athletes into educational trust funds.[98] Baker, who at the SBJ Form estimated around

12  100 schools would join the subdivision, described the $30,000 mark as a minimum "permissive

13  standard" that would ultimately allow schools to give even more money to more athletes than

14  currently contemplated. This new subdivision would also be empowered to make their own rules

15  related to policies such as scholarship commitments, roster size, recruitment, transfers, and name,

16  image and likeness.[99]

17      149.    This step by the NCAA shows that paying college athletes is perfectly compatible

18  with the big business of college sports and that the restrictions the NCAA seeks to maintain on

19  these payments, including limiting them to "educational" benefits or payments through trust

20  funds, cannot be justified in the current environment. Indeed, at the SBJ Conference, NCAA

21  President admitted that although the NCAA has millions of fans that go to their championships,

22  he used to hands to signal a big "0" (zero), when responding to his own question about how much

23  ─────────

24  [96] Noah Henderson, *Harbaugh Pushes for Student-Athletes Revenue Sharing*, Sports Illustrated (November 28, 2023), https://www.si.com/fannation/name-image-likeness/news/harbaugh-pushes-for-revenue-sharing-with-student-athletes-noah9.

25
26  [97] Nicole Auerbach, *NCAA Proposes Creation of New Subdivision With Direct Compensation for Athletes*, The Athletic (Dec. 5, 2023), https://theathletic.com/5114092/2023/12/05/ncaa-subdivision-athlete-compensation-charlie-baker/ (last visited Dec. 5, 2023).

27  [98] *Id.*

28  [99] *Id.*

the NCAA knows about them.

150.   Any continued claim by Defendants that amateurism is a procompetitive justification for the NCAA's rules prohibiting compensation to Division I college athletes is now factually bankrupt.

**2.   Any claimed procompetitive justification based on consumer demand for college sports is also legally irrelevant because it concerns an entirely different market.**

151.   Even if the NCAA could substantiate a claim that its pay-for-play restraints are justified by a need to distinguish college from professional sports and maintain consumer demand, such a justification would be of no legal significance in this case. The anticompetitive effects of the challenged restraints are in the relevant labor markets, while the claimed positive effects on consumer demand would (if they existed) be in the output-market for college sports. The rule of reason requires that any claimed offsetting procompetitive effects take place in the same relevant market as the demonstrated anticompetitive effects, and therefore, any cross-market justification is invalid. The Supreme Court in *Alston* noted this issue, but it did not need to reach it on the appellate record before it.[100]

**3.   Education and compensation for college athletes are not mutually exclusive.**

152.   The NCAA, in other litigation, has also argued that its compensation rules promote the integration of student-athletes with their academic communities and that payments based on athletic performance would "create a wedge" between college athletes and the student body at large, and therefore its rules are procompetitive.

153.   To begin with, this paternalistic rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on adult college athletes being able to receive compensation for their unique athletic abilities in a free market. It is instead an argument that competition itself is undesirable, which is not a procompetitive justification.

154.   In addition, income disparities already exist on college campuses as a result of family background and wealth derived from other sources. And, despite the existing disparities,

---

[100] *Alston*, 141 S. Ct. at 2155.

1    there is no evidence that students with more financial resources are negatively impacted in terms

2    of their integration with peers or the quality of education they receive.

3         155.   The ability to receive compensation for their athletic services will enhance, not

4    detract from, the integration and academic experiences of college athletes. Education and pay are

5    not mutually exclusive and are, in fact, pursued simultaneously by millions of college students

6    across America.

7         156.   In *Grant-in-Aid Cap*, the district court rejected, as a matter of fact, the NCAA's

8    so-called "academic integration" and "wedge" arguments,[101] and its finding was not challenged

9    by the NCAA on appeal. Moreover, the Ninth Circuit found a wealth of evidence showing that

10   NCAA rules already permit athletes to receive numerous above-COA payments "related and

11   unrelated to education."

12        157.   The challenged NCAA compensation restrictions do not promote integration and

13   in fact create a significant divide between the rights enjoyed by the rest of the student population

14   and college athletes. Non-athlete students are free to receive compensation from schools for their

15   unique abilities—whether in a school laboratory, working on a school newspaper, or working in a

16   university administrative office—but college athletes cannot be compensated for their athletic

17   abilities that bring immense wealth to their schools, conferences, and the NCAA.

18        158.   Further, Plaintiffs do not challenge the NCAA's existing rules and regulations that

19   require them to be students in good standing at their respective schools or that require athletes to

20   meet certain academic standards to remain eligible for competition. Rather, Plaintiffs only

21   challenge the rules preventing the athletes from receiving fair, market-based compensation for the

22   athletic services they render to their schools and conferences. To the extent that the NCAA's

23   academic-eligibility rules serve a legitimate purpose in distinguishing college from professional

24   sports and furthering educational values, they are not being challenged and will not be disturbed.

25        **4.    The challenged compensation restrictions do not prevent exploitation of
            college athletes—they are exploitative.**

26

27        159.   The NCAA has also previously argued that the elimination of its compensation

28   _____
     [101] *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1083–86.

restrictions would lead to the exploitation of college athletes. This is false.

160.    To begin with, this is not a legitimate procompetitive justification for a sweeping market restraint on adult college athletes being able to receive compensation in a free market for their unique athletic abilities that generate billions of dollars for their schools and conferences. It is an attack on competition itself, which is not a valid procompetitive justification under the Sherman Act.

161.    In a system where billions of dollars are generated off the athletic successes of college athletes, the restrictions on compensation for athletic services do not prevent exploitation—they are exploitative of the athletes. As previously discussed, all other actors— NCAA and P5-Conference executives, athletic directors, coaches, among others—make millions off of the backs of the athletes. But the athletes themselves are denied this same competitive opportunity in a free market. There thus cannot be any serious claim that the NCAA rules protect the athletes from exploitation.

162.    John Shoop, former offensive coordinator for the University of North Carolina football team described his first-hand perspective of the inequities of this system in a 2018 documentary: "I know people say these players get everything. No they don't get everything. What they get is a facility that might have a barbershop in it, tons of flat screen TVs, they might get a bunch of Nike spikes. At this time in their life, when they really did have incredible value, I was the one absorbing all that value, not them. That didn't feel good to me. I was the one getting paid a lot, not them. For some of these young men, these are the four years where their earning potential is higher than it's ever been. This is it. When they graduate, they're done… They're propelling a billion-dollar industry right here and they're getting a sweat suit for it."[102] And a large percentage of these exploited athletes are persons of color and persons who come from economically-disadvantaged communities.

---

[102] HBO, Student Athlete (2018), www.hbo.com/documentaries/student-athlete (last visited July 25, 2021).

**5.      The challenged restraints cannot be justified by the purported need to cross-subsidize non-revenue sports.**

163.    Recently, the NCAA has sought to justify its restraints in other litigation based on the purported need to prevent compensation to high-revenue-sport athletes from draining cross-subsidies to the non-revenue sports. This justification is legally and factually invalid.

164.    First, the justification is, once again, not procompetitive. It amounts to arguing that the efficient allocation of a competitive market is somehow undesirable and that there is a need to suppress compensation to higher-revenue-generating athletes so that they can subsidize non-revenue-generating sports. That is an argument that competition itself and allocative efficiency are undesirable, which is not a procompetitive or legally viable justification under the Sherman Act.

165.    Second, allowing compensation to high-revenue-sport athletes would not have a negative impact on any subsidies these sports provide to low- or non-revenue sports. The amount of these subsidies are tiny compared to the vast revenues generated by FBS football and Division I basketball, and thus any compensation for athletes in these high-revenue sports will not impact schools' ability to maintain their current subsidization of lower-revenue sports. In fact, history shows, that every time a new form of compensation has been permitted for Division I athletes—full COA, *Alston* education-related benefits, NIL payments—there has been no adverse impact on the subsidization of low- or non-revenue sports.

166.    Third, if needed, the excessive compensation paid to coaches, athletic directors, NCAA executives, and Conference commissioners (among others) show that there is more than enough money to make up for any hypothetical revenue reallocation that could impact low- or non-revenue sport subsidies. In Division III—where there are no high-revenue sports to subsidize others—the schools themselves support all sports (which are, by definition, non-revenue), just like they do all other activities at their institutions.

167.    In short, the claim that college-athlete pay-for-play compensation would harm low- or non-revenue sports is both factually unsupported and legally untenable as a purported justification for the Defendants' anticompetitive compensation restraints.

**F.      Plaintiffs have been injured by Defendants' anticompetitive restraints.**

168.    Defendants' rules capping the amount that Division I athletes may be compensated for their athletics services has damaged and will continue to damage these college athletes absent a court-imposed remedy. All Division I college athletes would have the competitive opportunity to receive pay-for-play compensation absent Defendants' unlawful restraints.

169.    Numerous published economic articles have concluded that the reason the schools find it profitable to overinvest in "second-best" ways to compete for the services of college athletes (such as excessive spending on facilities or coaches) is because of the compensation cap that prevents them from spending more on the competitive-market option, which would be to provide greater compensation directly to athletes. For instance, one articled concluded:

> Thus, one potential procompetitive justification for the current pay restrictions is that they may help prevent inefficient positional competition for athletes. However, the existing restrictions cannot be justified on this basis. First, they do nothing to alleviate the existing arms race in expenditures on facilities and coaches, both of which are widely used to recruit athletes. Colleges and universities compete excessively for athletic talent via these non-wage avenues, despite the pay restrictions. The current compensation restrictions become merely a mechanism to transfer value from players to colleges and coaches. Second, limiting player salaries in the current manner—via a cap essentially the same for all players—precludes variations depending on the relative values of different athletes.[103]

170.    Another academic article made similar observations: "The pay ceiling on intercollegiate athletes leads universities to 'overdose' on complementary inputs. The same institutions that have agreed not to compete on direct compensation to players instead compete furiously on the basis of other factors of production: program reputation; coach; quality of stadiums, arenas, weight-rooms, residence halls, and training-table food; scheduling games in attractive locations; and lavishing personal attention on recruits."[104]

---

[103] Christian Santesteban and Keith B. Leffler, *Assessing the Efficiency Justifications for the NCAA Player Compensation Restriction*s, 62(1) The Antitrust Bulletin 91–111 (January 24, 2017), https://doi.org/10.1177/0003603X16688838.

[104] Allen R. Sanderson and John J. Siegfried, *The Case for Paying College Athletes*, 29(1) Journal of Economic Perspectives 115–138 (Winter 2015), https://www.aeaweb.org/articles?id=10.1257/jep.29.1.115. Additionally, Andrew Zimbalist states "The factor contributing most directly to the coaches' outsize pay is the athletes' amateur status. In significant part, coaches are paid for the value produced by others, most notably the athletes they recruit." Andrew Zimbalist,

-55-

171.   This is not surprising because athletic departments compete vigorously to win. Because of the no pay-for-play rules, they spend excessive amounts of money on facilities and coaches to attract top athletes, and that is money that would otherwise go to the athletes if such compensation were allowed. At the Big Ten Media Days in August 2023, Indiana University head football coach, Tom Allen, stated: "The revenue-sharing piece is an important part of where we're going. How that looks, we've got to figure it out. . . . That's why the NFL puts all their money into paying their players and not worrying about having some fancy facility. It's gonna be nice, but it's not gonna be anything over the top. Why? Because it's, 'Hey, let's use this money to get the best players.'"[105]

172.   In competitive labor markets, Division I college athletes would receive compensation that responds to market forces. Just as the schools compete for coaches by paying higher salaries, they would compete for Division I college athletes by paying higher compensation and offering additional benefits. But the NCAA Bylaws prohibit such payments. That amounts to a horizontal restriction amongst competitors that artificially restrains the compensation provided to Division I athletes, causing antitrust injuries to the Division I college athletes in the relevant labor markets, including the Plaintiffs who have been deprived of the opportunity to offer their services in a competitive market.

## VII.   CLASS ALLEGATIONS

173.   Plaintiffs DeWayne Carter, Nya Harrison, and Sedona Prince bring this action under Federal Rule of Civil Procedure 23(b)(2) on their own behalf and on behalf of the following Declaratory and Injunctive Relief Class:

---

*CEOs with Headsets*, Harvard Business Review (September 2010), https://hbr.org/2010/09/ceos-with-headsets.

[105] Zach Osterman, *Revenue sharing for college athletes is 'direction we have to go.' How does it look?*, IndyStar (August 15, 2023), https://www.indystar.com/story/sports/college/indiana/2023/08/15/ncaa-revenue-sharing-next-step-in-evolution-of-college-sports-iu-tom-allen-scott-dolson-football/70430329007/.

1

The "Declaratory and Injunctive Relief Class"—

2

3

> All student-athletes who compete on, or competed on, a Division I athletic team at any time between December 7, 2023 and the date of judgment in this matter.

4

5

6

> This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

7

174.    Plaintiffs DeWayne Carter and Sedona Prince bring this action under Federal Rule

8

of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Damages Class:

9

The "Damages Class"—

10

11

12

13

> All current and former student-athletes who compete on, or competed on, a P5 Conference or Notre Dame basketball or football team, at any time between December 7, 2019 and the date of judgment in this matter. This Class excludes any athletes who competed for their school prior to March 21, 2017, and are bound by the class settlement releases in *In re: NCAA Athlete Grant-in-Aid Cap Antitrust Litigation.*

14

15

> This Class excludes the officers, directors, and employees of Defendants. This Sub-Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

16

17

18

175.    The Declaratory and Injunctive Relief Class and Damages Class are referred to collectively herein as "the Classes."

19

20

21

22

176.    The Classes are so numerous that joinder of all members is impracticable. While the exact number of members each of the Classes is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are several thousand members of each of the Classes.

23

24

25

26

177.    Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and other members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Classes were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein.

27

28

178.    Plaintiffs will fairly and adequately protect the interests of the members of the

Classes and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation and specifically antitrust litigation against the Defendants and their restraints of trade on college athletes.

179. Numerous common questions of law and fact exist as to all members of the Classes, and these common questions predominate over any questions affecting solely individual members of the Classes. Although in many cases the Defendants admit that they have in fact engaged in the conduct listed below, nevertheless among the questions of law and fact common to the Classes are:

        a.    Whether Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes;

        b.    Whether such conduct caused members of the Classes to receive less compensation than members of the Classes would have received in a truly competitive market;

        c.    The duration of the contract, combination, or conspiracy alleged herein;

        d.    Whether Defendants violated Section 1 of the Sherman Act;

        e.    Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and class members; and

        f.    Whether the Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

180. Additional common questions of law and fact specific to the Damages Class include the following:

        a.    The appropriate measure of damages sustained by Plaintiffs and Damages Class members; and

        b.    The existence of class-wide methods for measuring damages.

181. Defendants have acted or refused to act on grounds generally applicable to the members of Declaratory and Injunctive Relief Class, thereby making final injunctive relief

appropriate for the members of the Declaratory and Injunctive Relief Class as a whole.

182.    Plaintiffs' claims are typical of the Classes because the challenged restraints have injured both Plaintiffs and members of the Classes.

183.    Plaintiffs are adequate representatives of the Classes and will protect the claims and interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes and Plaintiffs will vigorously prosecute the claims alleged herein.

184.    A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by Plaintiffs and each member of the Classes are relatively small as compared to the enormous expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for Plaintiffs and members of the Classes to redress the wrongs done to them. It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

**VIII.   ANTITRUST ALLEGATIONS**

185.    The challenged compensation rules agreed to by Defendants constitute a contract, combination, and conspiracy in unreasonable restraint of trade, consisting of a continuing horizontal agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiffs and Class members for their athletic services in the relevant labor markets in the United States, its territories and possessions.

186.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and

conspired to do, including, among other things:

        a.   agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Plaintiffs and class members for their athletic services;

        b.   agreeing to engage in a group boycott of any Division I college athlete or NCAA member who violates the rules prohibiting the compensation of college athletes; and

        c.   implementing and monitoring the conspiracy among cartel members.

187. The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize prices paid to Plaintiffs and Class Members for their athletic services.

188. Defendants' actions constitute an unreasonable restraint of trade.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1
### PRICE FIXING

189. Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

190. Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal combination and conspiracy in unreasonable restraint of trade in the relevant labor markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Classes for the use of, and to limit supply for, their athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

191. Defendants' unlawful conduct deprived Plaintiffs and members of the Classes of unrestrained market-value compensation for the use of their athletic services. This unreasonable restraint on competition that fixed prices has artificially limited supply and depressed compensation paid to Plaintiffs and members of the Classes.

-60-

192.    Plaintiffs and members of the Classes received less compensation and fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets, and thus suffered antitrust injuries.

193.    The NCAA has always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for their athletic services except in limited circumstances dictated by the NCAA's rules.

194.    Defendants' and their co-conspirators' abridgment of Plaintiffs' and Class members' compensation rights is not justified by any legitimate procompetitive purpose. Defendants' actions are solely to enhance revenue for themselves by limiting compensation to college athletes for their athletic services. Defendants' actions cannot be justified by any alleged goal of "amateurism," or any legitimate procompetitive purpose. Defendants' concerted actions directly restrain the relevant labor markets without any procompetitive justification and are therefore unreasonable restraints of trade.

195.    As a direct and proximate result of Defendants' anticompetitive price-fixing actions, Plaintiffs and the members of the Classes have been injured. Plaintiffs' and Class members' injuries consist of receiving lower compensation and fewer benefits for use of their athletic services than they would have received absent Defendants' anticompetitive price-fixing conduct. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' price-fixing conduct unlawful.

196.    Defendants and their co-conspirators have collectively conspired to illegally fix, limit and depress the compensation to college athletes for their athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

197.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be asserted by Defendants, including their claim that their collusive conduct is justified by the NCAA's concept of "amateurism." Moreover, reasonable and substantially less restrictive alternatives are available to Defendants' price-fixing restraints on compensation to Division I college athletes for their athletic services, to the extent any

-61-

procompetitive justification for such restraints may be found to exist.

198.    Alternatively, Defendants' restraints on Plaintiffs' and Class members' ability to earn compensation for their athletic services should be determined to be either *per se* unlawful, or unlawful under the quick-look rule of reason, given the experience the courts have now had in evaluating the legality of such restraints.

199.    Plaintiffs Carter and Prince and the Damages Class seek damages in this action in an amount that has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, these Plaintiffs are entitled to recover from Defendants treble the amount of their actual damages.

200.    Plaintiff Carter, Harrison and Prince and the Injunctive Relief Class seek a permanent injunction against the challenged restraints on compensation to Division I college athletes. All such athletes have suffered, and will continue to suffer, antitrust injury by being deprived of the opportunity to market their athletic services in competitive labor markets until injunctive relief is granted.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1
### GROUP BOYCOTT

201.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

202.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing horizontal contract, combination, and conspiracy in restraint of trade to effectuate a group boycott of any members of the Classes who do not abide by the Defendants' compensation restraints on Division I athletes. Defendants' group boycott/refusal to deal encompasses Defendants' concerted acts to prevent Class Members from being compensated for their athletic services and/or their concerted refusal to permit compensation to be paid to members of the Classes for their athletic services, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

203.    Defendants' group boycott/refusal to deal includes Defendants' concerted action to

require all Class members to abide by the regulations and bylaws that require each of them to relinquish the rights to be compensated for their athletic services in a competitive market. Defendants use their eligibility rules as a threat of a group boycott to force all Class members, including Plaintiffs, to abide by the rules against pay-for-play compensation.

204.    Plaintiffs and members of the Classes received less compensation and fewer benefits than they otherwise would have received for the use of their athletic services in competitive labor markets, and thus suffered antitrust injuries.

205.    The NCAA has always conditioned eligibility to play Division I sports on the relinquishment to the NCAA and its members by the athlete of all rights to be compensated for their athletic services except in limited circumstances dictated by the NCAA's rules.

206.    Defendants and their co-conspirators' abridgment of Plaintiffs' and Class members' compensation rights through their agreed-to group boycott is not justified by any legitimate procompetitive justification. Defendants' actions are solely to enhance revenue for themselves by limiting compensation to Division I athletes for their athletic services. Defendants' concerted group boycott cannot be justified by any alleged goal of "amateurism," or any legitimate procompetitive purpose. Defendants' agreement to engage in a group boycott directly restrains the relevant labor markets without any procompetitive justification and is therefore an unreasonable restraint of trade.

207.    As a direct and proximate result of Defendants' group-boycott scheme, Plaintiffs and the members of the Classes have been injured. Plaintiffs' and Class members' injuries consist of receiving lower compensation and fewer benefits for use of their athletic services than they would have received absent Defendants' agreements to engage in a group boycott. Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' group-boycott conduct unlawful.

208.    Defendants and their co-conspirators have collectively conspired to engage in a group boycott to illegally limit and depress the compensation to college athletes for their athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

1    209.    The anticompetitive effects of Defendants' group boycott substantially outweigh

2    any alleged procompetitive effects that may be asserted by Defendants, including the Defendants'

3    claim that their group-boycott rules are justified by the NCAA's concept of "amateurism" or any

4    procompetitive purpose. Moreover, reasonable and substantially less restrictive alternatives are

5    available to Defendants' group-boycott rules restricting compensation to Division I college

6    athletes for their athletic services, to the extent any procompetitive justification for such rules

7    may be found to exist

8    210.    Alternatively, Defendants' group boycott/refusal to deal rules that have prevented

9    Plaintiffs and Class members from earning fair-market compensation for their athletic services

10   should be determined to be either *per se* unlawful, or unlawful under the quick-look rule of

11   reason, given the experience the courts have now had in evaluating the legality of such restraints.

12   211.    Plaintiffs Carter and Prince and the Damages Class seek damages in this action in

13   an amount that has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, these

14   Plaintiffs are entitled to recover from Defendants treble the amount of their actual damages.

15   212.    Plaintiff Carter, Harrison and Prince and the Injunctive Relief Class seek a

16   permanent injunction against the challenged group-boycott restraints on compensation to Division

17   I college athletes. All such athletes have suffered, and will continue to suffer, antitrust injury by

18   being deprived of the opportunity to market their athletic services in competitive labor markets

19   until injunctive relief is granted.

20                                **REQUEST FOR RELIEF**

21        WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request judgment as

22   follows:

23        A.    For actual damages for Plaintiffs Carter and Prince and the Damage Class

24              members according to the proof at trial;

25        B.    For treble damages for Plaintiffs Carter and Prince and the Damage Class

26              members pursuant to 15 U.S.C. § 15;

27        C.    For a declaratory judgment for all Plaintiffs and the Injunctive Relief Class

28

1  members declaring as void the NCAA Bylaws and rules that operate to restrict the

2  compensation Division I college athletes can receive in exchange for their athletic

3  services;

4  D.     For an injunction on behalf of all Plaintiffs and the Injunctive Relief Class

5  members restraining the NCAA and Conference Defendants from enforcing their

6  unlawful and anticompetitive agreements and rules that restrict the compensation

7  available to Plaintiffs and Injunctive Relief Class members in exchange for their

8  athletic services;

9  E.     For Plaintiffs' attorney fees, costs, and expenses; and

10  F.     For other such relief that the Court may deem just and equitable.

11                                **JURY DEMAND**

12  Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury

13  trial on any and all claims so triable.

14  Dated: December 7, 2023

15                                          HAGENS BERMAN SOBOL SHAPIRO LLP

16                                          By:    */s/ Benjamin J. Siegel*
                                                   Benjamin J. Siegel (SBN 256260)
17                                          715 Hearst Avenue, Suite 300
                                            Berkeley, CA 94710
18                                          Telephone: (510) 725-3000
                                            Facsimile:  (510) 725-3001
19                                          bens@hbsslaw.com

20
                                            Steve W. Berman (*pro hac vice forthcoming*)
21                                          Emilee N. Sisco (*pro hac vice forthcoming*)
                                            Stephanie Verdoia (*pro hac vice forthcoming*)
22                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1301 Second Avenue, Suite 2000
23                                          Seattle, WA 98101
                                            Telephone: (206) 623-7292
24                                          Facsimile: (206) 623-0594
                                            steve@hbsslaw.com
25                                          emilees@hbsslaw.com
                                            stephaniev@hbsslaw.com
26

27

28

Jeffrey L. Kessler (*pro hac vice forthcoming*)
David G. Feher (*pro hac vice forthcoming*)
David L. Greenspan (*pro hac vice forthcoming*)
Adam I. Dale (*pro hac vice forthcoming*)
Sarah L. Viebrock (*pro hac vice forthcoming*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile:  (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com
aidale@winston.com
sviebrock@winston.com

Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile:  (415) 591-1400
jparsigian@winston.com

*Counsel for Plaintiffs and the Proposed Classes*

CLASS ACTION COMPLAINT
011210-11/2405961 V1

Case No. 4:23-cv-6325